IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| JEFFREY LILLY and RAQUEL LILLY, <br><br> *Plaintiffs* <br><br> v. <br><br> MICHAEL HARRISON, <br> BRIAN NADEAU, <br> OLUFEMI AKANNI, <br> JASON CALLAGHAN, <br> LAMAR HOWARD, <br> DANIEL POPP, and <br> KENNETH THOMPSON <br><br> *Defendants.* | C.A. No: _____ <br><br> (Jury Trial Demanded) |

## COMPLAINT

### INTRODUCTION

1.      This is an action for money damages brought pursuant to 42 U.S.C §§ 1983, 1985(3) and 1986, the Fifth and Fourteenth Amendments to the United States Constitution, and under the common law of the State of Maryland, against Michael Harrison, Brian Nadeau, Olufemi Akanni, Jason Callaghan, Lamar Howard, Daniel Popp, and Kenneth Thompson in their individual capacities. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law.

2.      It is alleged that the individual Defendants engaged in a conspiracy to deprive the Plaintiffs of rights guaranteed by Maryland Law and the Constitution of the United States by weaponizing the investigative and disciplinary powers of the Baltimore Police Department's ("BPD") Public Integrity Bureau ("PIB") to harm the Plaintiffs for attempting to pursue their property rights and in retaliation for lodging an ethics complaint against high-ranking BPD

officials.

## PARTIES

3.      Plaintiff Jeffrey Lilly is an African American man, resident of the State of Pennsylvania and of full age.  At present, and since 2004, he is employed by BPD in Baltimore City, Maryland. He served as a Task Force Officer with the FBI, dually appointed as an FBI special agent and BPD officer, until the actions of the Defendants described herein disqualified him from that position.

4.      Plaintiff Raquel Lilly is an African American woman, resident of the State of Pennsylvania and of full age. She is the wife of Jeffrey Lilly. Raquel Lilly's family is a prominent police family. Her cousin is Captain Lekeshia Blue of BPD's Public Integrity Bureau. Mrs. Blue is the widow of James Blue. Mrs. Blue's mother and father, Delphine Smith and Robert Smith, are both retired BPD officers. Robert Smith retired as a Lieutenant Colonel. Delphine Smith retired as a Lieutenant. Mrs. Blue, Delphine Smith, and Robert Smith are hereinafter collectively referred to as the "Smith Family" or "the Smiths."

5.      Raquel Lilly and Jeffrey Lilly (hereinafter collectively referred to as "the Lillys" or "the Plaintiffs") operate a side business as hobby breeders in the State of Pennsylvania.  The business is not a formal entity registered with the Pennsylvania Secretary of State.  While conducting business, the Lillys use the name "Twisted Roots Kennels" to breed and sell French bulldogs and English bulldogs.

6.      Defendant Michael Harrison, at all times relevant to this complaint, was the Commissioner of BPD.  In his capacity as Police Commissioner, Defendant Harrison oversaw all aspects of BPD including its efforts to comply with the Consent Decree.[1] Integral to BPD's

---

[1] On April 7, 2017, the Baltimore Police Department, the Mayor and City Council of Baltimore and the United States Department of Justice entered into a Consent Decree aimed at addressing a pattern and practice of unconstitutional policing which has plagued public safety efforts and

efforts to comply with the Consent Decree was the reformation of the Public Integrity Bureau and the Department of Justice's mandate that the Bureau implement policies to ensure that complaints of officer misconduct are investigated in a thorough, fair, impartial and timely manner. In his capacity as Commissioner, Defendant Harrison made decisions directly impacting the internal affairs investigations which are relevant to this complaint and those decisions were prejudicial to the rights of the Plaintiffs.

7. Defendant Brian Nadeau, at all times relevant to this complaint, was a Deputy Commissioner of BPD and responsible for the reform and oversight of the Public Integrity Bureau. In his capacity as Deputy Commissioner, Defendant Nadeau testified in federal court regarding PIB's efforts to come into compliance with the Consent Decree. In his capacity as a Deputy Commissioner, Defendant Nadeau made decisions directly impacting the internal affairs investigations which are relevant to this complaint and those decisions were prejudicial to the rights of the Plaintiffs.

8. Olufemi Akanni, at all times relevant to this complaint, was the Director of BPD's Equal Opportunity and Diversity Section ("EODS"). EODS reported directly to Deputy Commissioner Nadeau and was responsible for investigating certain allegations of officer misconduct, violations of federal, state, and local law, and violations of internal BPD policies. EODS ran parallel to the internal investigations arm of PIB and, but for reporting to Deputy Commissioner Nadeau, had its own investigators and command structure. In his capacity as Director of EODS, Defendant Akanni made decisions directly impacting the internal affairs

---

harmed the citizens of Baltimore for decades. Of central importance to the court mandated reform of BPD was the premise that BPD must first endeavor to police itself by focusing on officer misconduct through transparency and fairness of internal investigations, and the avoidance of conflicts of interest in conducting those investigations. As part of the Consent Decree process, the parties to the Consent Decree agreed upon a Monitor tasked with and paid for overseeing the efforts of BPD and reporting on those efforts to the federal court presiding over the reform efforts.

investigations which are relevant to this complaint and those decisions were prejudicial to the rights of the Plaintiffs.

9.      Jason Callaghan is a retired member of BPD. From January 2022 through November 2022, Jason Callaghan was the Major of the Public Integrity Bureau and responsible for the oversight and operations of PIB. In that role, Major Callaghan reported directly to Deputy Commissioner Nadeau. Major Callaghan supervised captains, lieutenants, sergeants, and detectives and made decisions directly impacting the internal affairs investigations which are relevant to this complaint and those decisions were prejudicial to the rights of the Plaintiffs.

10.      Lamar Howard was a sworn officer of BPD for more than twenty-five years. Between January 2022 and September 2022, Lamar Howard served as a Captain within the Public Integrity Bureau.  In his capacity as a Captain, Defendant Howard reported directly to Major Callaghan and was responsible for the supervision and oversight of lieutenants, sergeants, and detectives falling within his chain of command. In his capacity as a Captain, Defendant Howard made decisions directly impacting the internal affairs investigations which are relevant to this complaint and those decisions were prejudicial to the rights of the Plaintiffs.

11.      Daniel Popp has been a member of BPD for 29 years. Between January 2022 through August 2022, Daniel Popp was a Lieutenant within the Public Integrity Bureau. Defendant Popp reported to Captain Howard and was responsible for overseeing sergeants and detectives, investigating complaints of misconduct, and instructing the chain of command on the status of those investigations. In his capacity as a Lieutenant, Defendant Popp made decisions directly impacting the internal affairs investigations which are relevant to this complaint and those decisions were prejudicial to the rights of the Plaintiffs.

12.      Kenneth Thompson is an attorney and a partner at the law firm Venable, LLP. The Consent Decree requires appointment of an independent Monitor and Monitoring Team to oversee the implementation of the Consent Decree.  On October 3, 2017, Judge Bredar

appointed Kenneth Thompson to be the Monitor, a position that he continues to hold. In January of 2023, Commissioner Harrison enlisted Mr. Thompson to oversee the internal affairs investigations which are relevant to this complaint. Mr. Thompson had unfettered access to the people, facilities, and files of the BPD to enable his oversight of BPD's efforts to come into compliance with the Consent Decree and enable him to ensure that BPD conducted thorough, fair, and timely internal investigations. In this capacity and in his capacity as Monitor of the Consent Decree, Defendant Thompson made decisions directly impacting the relevant internal affairs investigations and those decisions were prejudicial to the rights of the Plaintiffs.

13.     The officer defendants were at all times relevant to this complaint duly appointed agents of BPD, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Maryland, Baltimore City, and/or the United States.

14.     Kenneth Thompson was at all times relevant to this complaint the Lead Monitor for the Consent Decree. He was appointed by the Chief Judge of the United States District Court for the District of Maryland and in that capacity acted under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Maryland, Baltimore City, and the United States.

**FACTS**

15.     In October 2020, James Blue and the Plaintiffs entered into a contract whereby James Blue purchased a dog for $8,500.00 for the purpose of producing a litter of puppies in cooperation with the Plaintiffs.

16.     In exchange for his assistance in producing and caring for that litter, James Blue was to receive sixty percent of the proceeds from the sale of the puppies, after the Plaintiffs selected pick of the litter for future breeding efforts.

17.     The contract stated that the Plaintiffs would have exclusive ownership rights of any potential litter produced from breeding James Blue's dog with a dog belonging to the Plaintiffs.  Further, the agreement provided that only the Plaintiffs could enter into sales agreements for the puppies of any litter produced but James Blue would receive 60% of the proceeds from the sale of the puppies in that litter.

18.     James Blue personally signed the agreement on an electronic device in the presence of the Plaintiffs on October 18, 2020. The document was signed and authenticated using the DocuSign software program. The Plaintiffs returned the fully executed version of the agreement to James Blue via email at 6:38 PM that evening.[2]

19.     Since the birth of the puppies in late December 2021, James Blue had been in custody of the litter of five puppies bred in accordance with the contract.  The puppies were kept at the Blue residence in Randallstown, Maryland, while Jeffrey Lilly taught Mr. Blue how to care for the puppies and how to prepare and market them for sale.

20.     The value of the litter based on the market for French Bulldogs with characteristics similar to the dame and sire was $50,000.00 or more.

21.     The contractual agreement proceeded without incident between James Blue and the Plaintiffs until the days following James Blue's murder.

22.     On January 25, 2022, James Blue was murdered by Sahiou Kargbo in West Baltimore. Mr. Kargbo had two outstanding warrants at the time of the murder. The first warrant was issued on December 28, 2021, and the second on January 21, 2022.  Both warrants alleged Mr. Kargbo had committed crimes with the use of a handgun.

23.     Days before Mr. Blue's murder, the Baltimore County Police Department ("BCPD") requested the assistance of BPD to serve the second warrant.  The request for assistance was denied, and the warrant went unserved.

---

[2] See Exhibit 1, email from Plaintiffs to James Blue with contract attached.

24.     On January 27, 2022, the family of James Blue decided to keep the puppies permanently and denied the Plaintiffs the right to retrieve the dogs.

25.     Believing that the actions of the Smith Family were an indication that James Blue had not discussed the substance of the contract with his family, the Plaintiffs sent a copy of the agreement to the Smith Family.

26.     On January 28, 2022, Jeffrey Lilly spoke with Robert Smith, James Blue's father-in-law. Robert Smith acknowledged receipt of the contract and had several questions about its terms. Mr. Smith had previously asked to partner with the Plaintiffs in their dog-breeding business and had rejected the same terms as those that Mr. Blue agreed to. The conversation between Mr. Lilly and Mr. Smith did not resolve the dispute and the Plaintiffs' dogs were not returned.

27.     At this time, valid contracts existed between the Plaintiffs and third parties for the sale of certain puppies within the litter.

28.     Between January 28, 2022, and February 7, 2022, the Plaintiffs sought to retrieve the dogs and resolve the matter with the Smith Family. The Plaintiffs contacted Baltimore County Police Department to conduct welfare checks on the dogs and sought assistance in retrieving them from the Smith Family.

29.     On January 31, 2022, Jeffrey Lilly received a phone call from Lieutenant Colonel John "Jack" Herzog wherein Lt. Col. Herzog told Mr. Lilly to stop pursuing the return of the dogs. Lieutenant Colonel Herzog was one of Jeffrey Lilly's superiors in his chain of command. Lieutenant Colonel Herzog told Jeffrey Lilly that his call to intervene in the matter was made at the direction of Deputy Commissioner Sheree Briscoe.

30.     Deputy Commissioner Sheree Briscoe was Jeffrey Lilly's highest-ranking superior within his chain of command, directly under Commissioner Michael Harrison.

31.     The communications from superior officers within his direct chain of command about a non-work-related matter were intimidating to Mr. Lilly who felt his job could be in jeopardy if he were to continue his efforts to retrieve his property.

32.     On February 2, 2022, Jeffrey Lilly was advised by a former colleague that the FBI was initiating an investigation against him because of the dispute with Mr. Blue's family.

33.     Later that morning, Jeffrey Lilly met with Detective Jared Stern to complain that he was being retaliated against at work due to the civil dispute with the Smith Family, and that he didn't feel comfortable reporting his concerns to PIB because the dispute involved Lieutenant Blue and her family. Detective Stern was also a Task Force Officer, assigned to investigate internal affairs complaints and complaints of public corruption.

34.     Later that day, Raquel Lilly filed a formal complaint of misconduct against Lieutenant Colonel Jack Herzog and Deputy Commissioner Sheree Briscoe alleging they inappropriately interfered in a private family matter and that the way they had interfered created a hostile work environment for Mr. Lilly.[3]

35.     The complaint was given an internal PIB number of 2022-0156 and assigned to Director Olufemi Akanni to investigate. The case was assigned to Director Akanni because of the obvious conflict of interest that PIB had in conducting the investigation, due to the complaint involving Lieutenant Lekeshia Blue and her family.

36.     Director Akanni later admitted that despite the conflict, he communicated with Deputy Commissioner Nadeau about the investigation and received direction from Deputy Commissioner Nadeau regarding his investigative steps.

37.     On February 4, 2022, Olufemi Akanni was instructed by Deputy Commissioner Nadeau to meet with Jeffey Lilly. During that meeting Jeffrey Lilly told Director Akanni about the improper influence that Lieutenant Colonel Herzog and Deputy Commissioner Briscoe

---

[3] See Exhibit 2 - Raquel's Lilly's Complaint.

exerted days earlier. He also voiced concern that if he continued to pursue his property that BPD would retaliate against him and his job would be in jeopardy.

38.   On February 7, 2022, Mr. Lilly was notified by Director Akanni that Deputy Commissioner Nadeau wished to speak with him privately.

39.   On February 8, 2022, Jeffrey Lilly met with Deputy Commissioner Nadeau and Director Akanni at BPD Headquarters. During the meeting, Deputy Commissioner Nadeau made statements to intimidate Mr. Lilly into abandoning the pursuit of his property and ending his efforts to enforce his contracts. Deputy Commissioner Nadeau said that Jeffrey Lilly could get into a lot of trouble if Raquel Lilly continued to have the Baltimore County Police Department make welfare checks on the dogs and stated that Jeffrey Lilly was responsible for the actions of his wife.

40.   Immediately following the meeting, Jeffrey Lilly again warned Director Akanni that he thought he would be retaliated against if he continued to pursue his property. Director Akanni acknowledged Mr. Lilly's complaint and assured Mr. Lilly that he would monitor the situation.

41.   The Plaintiffs stopped all personal, phone, and electronic communications with the Smith Family on February 8, 2022.

42.   The funeral for James Blue took place on February 19, 2022.

43.   At a deposition on December 5, 2024, Defendant Harrison testified under oath that he was made aware of complaint 2022-0156 prior to the funeral of James Blue and that because of the obvious conflict within PIB, he specially assigned the investigation of that complaint to Director Akanni.

44.   At the same December 5th deposition, Commissioner Harrison testified that upon becoming Commissioner of BPD he executed a memorandum of understanding with the Office of the Inspector General ("OIG") stating that OIG would investigate all complaints made

against Commissioner Harrison or members of his executive team. Despite the standing agreement with OIG, Commissioner Harrison did not transfer Raquel Lilly's complaint against Sheree Briscoe, a member of the executive team, to OIG.

45.     On March 3, 2022, the Plaintiffs hired attorneys to pursue legal avenues for the return of their property.

46.     On March 10, 2022, Counsel for the Plaintiffs sent a written demand letter via certified mail to the Smith Family. The letter demanded the immediate return of the puppies to the Plaintiffs and was delivered to the home of Robert and Delphine Smith.

47.     On March 14, 2022, the Smith Family received the Plaintiffs' demand letter. Jerry McLarin, an employee of BPD assigned to PIB, was at the Smith home when the letter was received. Upon observing the Smith Family's receipt of the legal correspondence, Mr. McLarin arranged for Robert and Delphine Smith to file a PIB complaint against Jeffrey Lilly. The complaint was filed that day and assigned investigative number 2022-0347.

48.     On March 14, 2022, Robert and Delphine Smith gave a statement to Detective Anthony Bowling and Defendant Daniel Popp of PIB. The statement was recorded in accordance with PIB policies. On information and belief, Lieutenant Popp destroyed the recording.

49.     Detective Bowling immediately determined that there was a conflict of interest and that he needed to recuse himself from the investigation.

50.     On March 24, 2022, Lieutenant Popp emailed Captain Howard advising him that Detective Bowling and other detectives under his command were uncomfortable investigating complaint 2022-0347 because the allegations involved superiors within PIB and their investigation of the matter was precluded by the PIB Manual.[4]

---

[4] The PIB Internal Operations and Training Manual is the codification of the carefully crafted reforms mandated by the Consent Decree. Monitors referred to the Manual as a state of the art,

51.     On March 25, 2022, Major Callaghan sent an email to Captain Howard, Lieutenant Popp and Sergeant Kenneth Williams, ordering them to advise him of when Detective Lilly would be interviewed and to thereafter provide him with an audio file of the interview and written summary.

52.     At a deposition on October 1, 2024, Defendant Popp was asked why he kept control of the investigation despite the conflict cited by so many of his detectives, and his prior professional relationship with Robert Smith[5]. In response to this line of questioning, Defendant Popp testified under oath that he was following orders to keep the investigation under his control.

53.     On information and belief, Captain Howard ordered Lieutenant Popp to maintain control of the investigation of complaint 2022-0347 to please the Smith Family and exert pressure over Jeffrey Lilly.

54.     On March 29, 2022, Detective Bowling authored a memorandum requesting his recusal from investigating complaint 2022-0347 against Jeffrey Lilly.[6] Further, he noted that based on the statement given by Robert and Delphine Smith, Deputy Commissioner Nadeau needed to be investigated for an apparent charge of Neglect of Duty.  Detective Bowling

---

best in the country, investigative manual. Its creation and adoption have been praised in testimony given before the Court overseeing the Consent Decree as a collaborative effort between the DOJ, the BPD, the Monitoring Team, and the public. It took two years to develop after having every word painstakingly reviewed. The Manual was created with the specific intent of being a practical set of policies that would ensure each investigation could be conducted comprehensively and concluded timely. Despite publicly praising the Manual, at his deposition on October 22, 2024, Deputy Commissioner Nadeau repeatedly testified under oath that the Manual is not binding on him or his subordinates in PIB and that its contents are not policy but merely suggestive. Deputy Commissioner Nadeau's deposition testimony is in direct conflict with his public testimony before the Court and with the multiple recusal requests submitted by PIB Detectives assigned to PIB case numbers 2022-0156 and 2022-0347, wherein the detectives cited the Manual as the authority which mandated BPD's recusal.

[5] Daniel Popp testified that he had previously worked under Robert Smith's command. Further, he communicated with Captain Howard in emails wherein he referred to Robert Smith by his nickname, "Smitty".

[6] See Exhibit 3 - Request for Recusal and Memorandum of Detective Anthony Bowling

emailed his recusal memorandum to Lieutenant Popp, Captain Howard and Major Callaghan and received delivery and read receipts for the email.[7]

55.     Detective Bowling's memorandum referenced the PIB Investigative Manual's explicit policy regarding the mandatory transfer of 2022-0156 and 2022-0347 to an outside agency because of the conflicts of interest that existed.[8] Nevertheless, the Defendants arbitrarily refused to transfer the investigations and cure the conflict.

56.     In April of 2022, Raquel Lilly contacted PIB to check the status of the complaint she filed on February 2nd because she was concerned that nothing had been done with her complaint. She spoke with Detective Atancil, who informed her that there was no record of her complaint in PIB's case management system, IA Pro.

57.     Beginning April 4, 2022, Jeffrey Lilly's FOP attorney, Michael Davey, also requested that PIB transfer the investigation of 2022-0347 in multiple emails to Deputy Commissioner Nadeau due to the obvious conflict. Deputy Commissioner Nadeau received those emails and forwarded them to Major Callaghan.

58.     On April 13, 2022, Major Callaghan, at the direction of Deputy Commissioner Nadeau, denied Mr. Lilly's request.

59.     On April 13, 2022, Michael Davey scheduled Jeffrey Lilly's initial interrogation with PIB for Tuesday, April 26th at 9:00AM. Per PIB policy, the time and place of this interrogation is confidential.

60.     On April 22, 2022, Lieutenant Popp disclosed the time and location of Jeffrey Lilly's initial interrogation to Robert Smith and Delphine Smith in a telephone conversation.[9] He also instructed Robert and Delphine Smith to file criminal charges for forgery.

---

[7] See Exhibit 4 – Emails and Receipts from Detective Anthony Bowling to Chain of Command
[8] See Exhibit 5 – PIB Investigative Manual, Section VI: Conflict Investigations
[9] See Exhibit 6 – Email from Lieutenant Popp to Captain Howard

61.     Lieutenant Popp knew that a forgery charge was a felony, that it would result in Jeffrey Lilly being suspended without pay, would disqualify him from serving as a Task Force Officer, and would derail Jeffrey Lilly's career.

62.     On April 25, 2022, Delphine Smith swore out criminal charges for forgery against Jeffrey Lilly and emailed a copy of the charging statement directly to Lieutenant Popp. Lieutenant Popp assured her that the charges would be served the next day.

63.     The following morning at 7:18 AM, Lieutenant Popp forwarded the email from Delphine Smith to Deputy Commissioner Nadeau, Major Callaghan and Captain Howard.

64.     On April 27, 2022, Mr. Lilly was suspended without pay, despite the fact that he had not yet received a hearing and in contravention of the explicit instructions to the contrary appearing on Form 154 – Suspension of Police Powers.[10] He was immediately removed from the FBI Task Force.

65.     At the time of his suspension, Mr. Lilly was the lead investigator and affiant on a wiretap investigation that sought to solve a series of homicides, non-fatal shootings, and drug-trafficking crimes in Baltimore City. On information and belief, Jeffey Lilly's removal had a negative impact on the investigation.

66.     On May 5, 2022, Mr. Lilly appeared before members of the PIB to determine if his suspension would continue to be unpaid. Mr. Lilly presented evidence of an electronically signed and authenticated DocuSign contract between the Plaintiffs and James Blue. This contract was the document that Delphine Smith claimed was a forgery, a document which had been sent to her by the Plaintiffs on January 27th.  Mr. Lilly also presented text messages and photos at the hearing as further proof of the validity of his business relationship with Mr. Blue.

---

[10] See Exhibit 7 – Form 154, Suspension of Police Powers

67.     Despite the compelling nature of the evidence presented, and to the shock of Mr. Lilly, Mr. Davey, and indeed BPD's own attorney, Phil Motsay, Captain Michael Newton upheld the decision to suspend Mr. Lilly without pay.

68.     On information and belief, and in similar fashion to Robert and Delphine Smith's March 14th taped statement, the recording of Jeffrey Lilly's hearing was destroyed by Lieutenant Popp.

69.     Captain Newton reported directly to Major Jason Callaghan, who reported directly to Deputy Commissioner Nadeau.

70.     On June 9, 2022, Mr. Lilly appeared before the District Court for Baltimore County to face the criminal charge sworn out by Delphine Smith on April 25th.  Mr. Lilly provided the Baltimore County State's Attorney's Office with much of the same evidence provided to BPD during Mr. Lilly's May 4th hearing.  As a result of the evidence presented, the Baltimore County State's Attorney's Office declined to prosecute Mr. Lilly and entered a *nolle prosequi*, dismissing the charges.[11]

71.     The PIB Investigative Manual requires investigators who discover evidence that could implicate a respondent in the commission of a crime to immediately contact the relevant prosecuting agency and seek guidance on filing criminal charges. Had Lieutenant Popp followed policy, and sought the guidance of the relevant prosecuting agency, charges against Mr. Lilly would not have been approved and his career would not have been destroyed.

72.     On August 12, 2022, counsel for Plaintiffs served notice of intent to file suit on BPD. No witnesses were interviewed, and no investigative actions were taken in either complaint until after this date.

---

[11] See Exhibit 8 – Email Chain Between Jordan Riger and Detective Michael Payne

73.     On September 13, 2022, Plaintiffs filed a lawsuit against BPD alleging violations of their civil rights[12]. On that day, Detective Mathis of PIB noted an attempt to call Raquel Lilly regarding her complaint for the first time. Her complaint was filed two hundred and twenty-three (223) days earlier. Despite the explicit instructions of her written complaint to contact her through her attorney, no such call was made.

74.     On December 8, 2022, BPD requested that Baltimore County Police Department ("BCPD") investigate PIB complaints 2022-0156 and 2022-0347 to resolve the conflicts of interest that the Defendants had all known about for nine months. BCPD accepted the cases and began investigating on December 15, 2022.

75.     BCPD immediately identified ten witnesses that needed to be interviewed to competently investigate the cases. Deputy Commissioners Nadeau and Briscoe, as well as Olufemi Akanni were among the witnesses identified.

76.     On December 21, 2022, BCPD interviewed Director Akanni as a witness. The interview was recorded, and Baltimore County has provided the taped statement and their complete investigative file to counsel for Plaintiffs.

77.     In his taped statement to BCPD Detectives, Director Akanni made several statements concerning the Defendants' handling of the matter involving Detective Lilly. When pressed on why it took so long to transfer the cases, Director Akanni indicated that he, Commissioner Harrisson, and Brian Nadeau immediately identified the conflict of interest in the two cases but was unable to give a clear answer as to why the cases had not been transferred earlier.

78.     Director Akanni also indicated that even though Raquel Lilly's case had been assigned to EODS because of PIB's conflict, he communicated with Deputy Commissioner

---

[12] See 1:22-CV-02752-BAH.

Nadeau about Raquel Lilly's complaint. Director Akanni also stated that he was instructed by Major Callaghan to cease all investigative efforts.

79.     After conducting the interview of Director Akanni, BCPD identified more witnesses and determined that they could not competently perform the investigations within the allotted time frame.[13]

80.     On December 22, 2022, BCPD notified BPD that the cases were being returned.

81.     On January 3, 2024, Commissioner Harrison authored a memorandum reassigning the investigation of both cases to Director Akanni. The memorandum also took the extraordinary action of assigning Kenneth Thompson, Monitor of the DOJ Monitoring Team for the Consent Decree, "to monitor the investigative process and ensure transparency and fairness throughout the process."[14]

82.     At his deposition on December 5, 2024, Commissioner Harrison testified under oath that he could not recall any other time where a member of the DOJ Monitoring Team was assigned to have any involvement with an active investigation.

83.     Commissioner Harrison also testified that he assigned Mr. Thompson to oversee the cases and that "[his]expectations of Mr. Thompson was to bring credibility to [the] process, as he was the Consent Decree monitor; and this had become a high-profile matter which got a lot of media attention, even the attention of the court overseeing our Consent Decree."

84.     Commissioner Harrison explained more fully why Monitor Thompson was assigned to oversee the investigation and what he expected of him, stating: "Mr. Thompson being the monitor has unfettered access to everything in the agency, every facility, and has access – unfettered access and doesn't need permission or a – or a set of keys to enter the

---

[13] Pursuant to the Law Enforcement Officer's Bill of Rights, internal affairs investigations of police officers are to be completed within one year of the date the complaint was filed.
[14] See Exhibit 9 – January 3, 2023, Memorandum of Commissioner Harrison

buildings and to go anywhere to do anything and to compel anybody to provide information. So I did not have to – I did not have to set up any special protocols for him because if he wanted to go to PIB and to ask questions and make them demonstrate what they were doing, he could do that."

85.     On January 3, 2023, Detective Jahlik Mathis requested that Director Akanni recuse Detective Mathis from investigating case 2022-0156.[15] On information and belief, Director Akanni refused Detective Mathis's request and ordered Detective Mathis to keep 2022-0156. Detective Jasmine Doyle was assigned to investigate 2022-0347.

86.     On January 4, 2023, BCPD returned the investigative files over to Detective Mathis of the PIB. Upon receiving the files, Director Akanni ordered the detectives assigned to the cases not to interview any witnesses, to close both cases, and ordered the detectives not to issue formal close-out letters to case respondents until they were told to do so.

87.     An entry in the investigative file for complaint 2022-0347 authored by Detective Jasmine Doyle, dated January 4, 2023 states: "1-4-23….Advised by Director Akanni to not interview Captain Blue and Respondent Lilly.  Advised to determine findings based on evidence.  This is not the usual investigative process."

88.     On January 5, 2023, Detective Mathis submitted his investigative report on Raquel Lilly's complaint – EODS Case #2022-0156.

89.     Detective Mathis ultimately concluded, "Therefore, until further information can be obtained the allegation of Inappropriate Workplace Conduct and Conduct unbecoming of a Police Officer is rendered a finding of **Unfounded**."

90.     'Unfounded' is defined in BPD General Disciplinary Process, Policy 308, attached hereto.[16] A finding of 'Unfounded' is only appropriate where the investigation

---

[15] See Exhibit 10 – January 3, 2023 Request for Recusal of Detective Jahlik Mathis
[16] See Exhibit 11 - BPD Policy 308 in Relevant Part

determines, by clear and convincing evidence that the alleged misconduct did not occur or did not involve the employe under investigation.

91.    Conversely, Policy 308 provides the following definition for 'Not Sustained': "where the investigation is unable to determine, by a Preponderance of the Evidence, whether the alleged misconduct occurred."

92.    No interviews were conducted and no evidence was reviewed prior to Detective Mathis making his findings.

93.    On January 6, 2023, Director Akanni ordered investigators not to send close-out letters to complainants or respondents. The order was in direct contradiction with the ordinary investigative policies and practices of PIB. Even the investigative file for 2022-0347 explicitly noted that the directive from Director Akanni was "not the usual investigative process."

94.    On January 27, 2023, PIB complaint 2022-0156 was officially closed and a letter was sent to Mrs. Lilly advising that the Defendants' investigation revealed that the available evidence did not meet the burden of proof necessary to sustain her allegations. Despite Mrs. Lilly's clear instruction in her written complaint to contact her through her attorneys, BPD never attempted to do so. Not a single interview was conducted in her case.

95.    In contrast to the findings in 2022-0156 wherein Raquel Lilly complained that BPD command staff acted unethically, the investigative findings for the allegations against Jeffrey Lilly in 2022-0347 resulted in a finding of "not sustained." The difference in the investigative findings was an intentional act meant to discredit Jeffrey and Raquel Lilly and protect high-ranking police officials.

96.    Director Akanni's instructions to Detectives Doyle and Mathis to close the cases without conducting any interviews, and to wait for instruction before sending close-out letters were recorded in the case files for both 2022-0156 and 2022-0347 and patently against policies

set forth in the PIB Investigative Manual. Despite this, Mr. Thompson failed to prevent Director Akanni's actions, failed to ensure that the investigations were properly conducted and contributed to the violation of the Plaintiffs' rights.

97.    The retaliatory actions of the Defendants mirrored Jeffrey Lilly's warning to Director Akanni a year earlier. The Plaintiffs have stood helplessly by and endured the punishment they predicted they'd face ever since Raquel Lilly filed her ethics complaint and Jeffrey Lilly complained to EODS in February of 2022.

98.    Jeffrey Lilly has not been paid his due and payable wages owed from his unpaid suspension.

99.    Jeffrey Lilly's personal and professional reputation has been damaged because of being criminally charged with forgery at the encouragement of Lieutenant Popp. His damaged reputation excludes him from his former prestigious assignment as an FBI Task Force Agent, as well as other investigative roles that require him to swear out warrants or testify in court. His exclusion from those opportunities has limited his earning potential, promotion potential, and from employment opportunities in law enforcement outside BPD. Additionally, and because of the stain on his reputation, Mr. Lilly lost his secondary employment with the Baltimore Ravens. The job was coveted, one that he enjoyed, and that he hoped to continue full-time at the end of his career with BPD.

100.    Jeffrey Lilly has endured emotional distress because of the actions of the Defendants. The Plaintiff's children were forced to return from school due to his inability to make tuition payments during his unpaid suspension and the financial losses associated with his lost property. Since February of 2022, the Plaintiff suffered from severe depression and anxiety. He lost sleep, regularly had chest pains, and suffered anxiety attacks that required medical treatment.

101.    On June 22, 2022, Jeffrey Lilly sought medical attention for the symptoms described above. There, he was told by his medical provider that he likely suffered a heart attack and has since required daily medication. Mr. Lilly attributes his mental and physical health issues to the conduct of the Defendants.

102.    On April 26, 2023, Raquel Lilly attempted to take her own life due to the pain of watching her husband's career implode and seeing her family relationship deteriorate. Raquel Lilly attributes the feelings of stress and pain that led to her attempted suicide to the actions of the Defendants. She has since received ongoing treatment for depression and other mental health diagnoses.

103.    Both the loss of revenue and the loss of the pick of the litter from the contract the Lillys had with James Blue caused a compounding loss of future revenue from litters they expected to produce. Twisted Roots Kennels has all but ceased operations because of the Defendants' actions.

104.    On May 10, 2023, Jeffrey Lilly filed for Bankruptcy under Chapter 13 because of the financial harm he suffered at the hands of the Defendants.

105.    Conversely, the Defendants continue to enjoy their careers, and many have been promoted. Deputy Commissioner Nadeau is now one of only two Deputy Commissioners of BPD (after being one of four) and he controls more aspects of the agency than he did in 2022. Director Akanni holds the highest civilian-rank possible as the Chief of Public Integrity and oversees all misconduct investigations in PIB. Jason Callaghan was promoted from Major to Lieutenant Colonel in November of 2022 before his retirement from BPD in 2024. Lamar Howard has since left BPD and is now the Captain and Operations Commander of the Anne Arundel County Police. Daniel Popp was promoted from Lieutenant to Captain in August of 2022, after his suggested forgery charge ruined Jeffrey Lilly's career.

106.    At all times during the events described above, the Defendants were engaged in a joint venture. The individual Defendants assisted each other in performing the actions described herein and lent their support and the authority of their office to each other during the said events.

107.    As a direct and proximate result of the acts of the Defendants described herein above, the Plaintiffs suffered the following injuries and damages;

     a.  Violation of their Due Process rights under the Fifth and Fourteenth Amendment to the United States Constitution;

     b.  Violation of their right to enforce a contract under Article I, Section 10, Clause 1 of the United States Constitution;

     c.  Loss of revenue owed to the Plaintiffs for the litter produced under the contract;

     d.  Loss of future revenue from their dog breeding business;

     e.  Physical pain and suffering and emotional trauma and suffering; and

     f.  Damage to their careers and reputations.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983 Against Individual Defendants

108.    Paragraphs 1 through 107 are incorporated herein by reference as though fully set forth.

109.    The conduct of the individual Defendants described above herein was done with racial animus, intended to deprive the Plaintiffs of rights guaranteed under the Laws of the State of Maryland, Article I Section 10, Clause 1 of the United States Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution.

110.     The conduct undertaken by the individual Defendants described herein above was under color of law, custom and usage and by the authority given to them by state law in their capacity as officers and agents of the BPD and was in violation of 42 U.S.C. §1983.

111.     As a direct and proximate result of the Defendants' actions the Plaintiffs were deprived of rights guaranteed to them by Maryland Law and the Constitution of the United States and have suffered and continue to suffer other damages as described herein above.

## COUNT II
### 42 U.S.C. § 1985 Against Individual Defendants

112.     Paragraphs 1 through 107 are incorporated herein by reference as though fully set forth.

113.     The above-named Defendants did conspire for the purposes of depriving, either directly or indirectly, the Plaintiffs of their rights guaranteed under the laws of Maryland and the United States Constitution.

114.     The acts described herein were undertaken in furtherance of the conspiracy.

115.     As a direct and proximate result of the Defendants' actions the Plaintiffs were deprived of rights guaranteed to them by Maryland Law and the Constitution of the United States and have suffered and continue to suffer other damages as described herein above.

## COUNT III
### 42 U.S.C. § 1986 Against Individual Defendants

116.     Paragraphs 1 through 107 are incorporated herein by reference as though fully set forth.

117.     The Defendants had knowledge that the wrongs described herein were conspired to be done.

118.     Each Defendant had the power to prevent or aid in the prevention of the commission of the conspiracy and neglected or refused to do so.

119.     As a direct and proximate result of the Defendants' refusal to exercise reasonable diligence to prevent the conspiracy, the Plaintiffs were deprived of rights guaranteed to them by Maryland Law and the Constitution of the United States and have suffered and continue to suffer other damages as described herein above.

## COUNT IV
### Malicious Prosecution Against Daniel Popp

120.     Paragraphs 1 through 107 are incorporated herein by reference as though fully set forth.

121.     On April 22, 2022, Daniel Popp induced Delphine Smith to institute a criminal action against Jeffrey Lilly.

122.     On June 9, 2022, the prosecution of the charges brought because of Daniel Popp's inducement resulted in Jeffrey Lilly's favor.

123.     There was no probable cause to initiate the charges against Jeffrey Lilly.

124.     Daniel Popp acted with the malicious intent of harming Jeffrey Lilly's career, as he knew the charges would result in Jeffrey Lilly's unpaid suspension and that Jeffrey Lilly would be disqualified from his position as an FBI Task Force Agent.

125.     As a direct and proximate result of Daniel Popp's actions Jeffrey Lilly has suffered and continues to suffer damages as set forth herein above.

**WHEREFORE**, the Plaintiffs claim:

1. Compensatory damages.

2. Punitive damages.

3. Damages and attorneys' fees under 42 USC § 1983, 1985, and 1986.

4. Such other relief as law or equity permits.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial on all triable issues of fact raised by this Complaint.

Respectfully submitted
THE PLAINTIFFS,


By /s/_____
Michael Turiello, Esq. (#30383)
Skeen Law Offices
252 E. High Street
Charlottesville, VA 22902
mturiello@skeenlaw.com

Patrick Jennings, Esq. (#30362)
Jeffrey L. Ment, Esq. (*Pro Hac Vice*)
Ment Law Group
225 Asylum Street – 15th Floor
Hartford, CT 06103
pjennings@mentlaw.com
jment@mentlaw.com