IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JEFFREY LILLY ET AL., | * | |
| Plaintiffs, | * | |
| v. | * | |
|  | * | Civil No. 25-00240-BAH |
| MICHAEL HARRISON ET AL., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Jeffrey Lilly and Raquel Lilly (collectively "Plaintiffs") brought suit against Michael Harrison, Brian Nadeau, Olufemi Akanni, Jason Callaghan, Lamar Howard, Daniel Popp, and Kenneth Thompson ("Thompson") alleging a § 1983 claim (Count I), a § 1985 claim (Count II), a § 1986 claim (Count III), and a malicious prosecution claim against Daniel Popp (Count IV). ECF 1. Pending before the Court is Thompson's Motion to Dismiss the Complaint (the "Motion.").[1] ECF 22. Plaintiffs filed an opposition, ECF 27, and Thompson filed a reply, ECF 31. All filings include memoranda of law and Plaintiffs' response includes an exhibit.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Thompson's Motion is **GRANTED**.

---

[1] The remaining Defendants filed separate motions to dismiss, which will be addressed in a separate memorandum opinion once the motions are ripe for this Court's review.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

I. **BACKGROUND**

Plaintiff Jeffrey Lilly has been employed by the Baltimore Police Department ("BPD") in Baltimore City, Maryland since 2004. ECF 1, at 2 ¶ 3. His wife, Raquel Lilly, is from a "prominent police family," and many of her family members are also current or former members of BPD. *Id.* ¶ 4. The Lillys breed and sell French and English bulldogs through their business named Twisted Roots Kennels. *Id.* ¶ 5.

The underlying factual allegations in the Complaint relate to a familial dispute between Jeffrey Lilly, Raquel Lilly, and Raquel Lilly's cousin, aunt, and uncle. The dispute centers on who was entitled to physical possession of puppies bred by Twisted Roots Kennels, and later, who was entitled to sell the puppies and retain the proceeds. *See* ECF 1, at 5–10. At its core, the Complaint alleges that Defendants, who are all employed by the BPD except for Thompson, mishandled the investigation of Plaintiffs' Public Integrity Bureau ("PIB") complaint, which alleged misconduct by PIB officials in responding to the familial dispute. *Id.* at 7–16.

As relevant here, on February 2, 2022, Raquel Lilly "filed a formal complaint of misconduct against Lieutenant Colonel Jack Herzog and Deputy Commissioner Sheree Briscoe alleging they inappropriately interfered in a private family matter and that the way they had interfered created a hostile work environment for Mr. Lilly."[3] ECF 1, at 8 ¶ 34. On February 4, 2022, Director Akanni was instructed by Deputy Commissioner Brian Nadeau to meet with Jeffrey Lilly. *Id.* ¶ 37. During that meeting, Jeffrey Lilly allegedly told Director Akanni about "the improper influence that Lieutenant Colonel Herzog and Deputy Commissioner Briscoe exerted days earlier," and "voiced concern that if he continued to pursue his property [the puppies] that BPD would retaliate against him and his job would be in jeopardy." *Id.* The Complaint then goes

---

[3] The formal complaint was assigned to Director Olufemi Akanni to investigate. ECF 1, at 8 ¶ 35.

on to recount alleged intimidation of Jeffrey Lilly by various BPD officials, and PIB officials' alleged failure to adhere to internal procedures in processing the complaint. *Id.* at 9–14. Plaintiffs' primary argument is that Defendants collectively "engaged in a conspiracy to deprive the Plaintiffs of rights guaranteed by Maryland Law and the Constitution of the United States by weaponizing the investigative and disciplinary powers of the Baltimore Police Department's [] Public Integrity Bureau [] to harm the Plaintiffs for attempting to pursue their property rights and in retaliation for lodging an ethics complaint against high-ranking BPD officials." *Id.* at 1 ¶ 2. Because the instant Motion is limited in scope to Thompson, the Court will not repeat the various allegations against the other Defendants here, but instead confine the summary to the allegations related to Thompson.

According to the Complaint, on April 7, 2017, "the Baltimore Police Department, the Mayor and City Council of Baltimore and the United States Department of Justice entered into a Consent Decree aimed at addressing a pattern and practice of unconstitutional policing which has plagued public safety efforts and harmed the citizens of Baltimore for decades."[4] ECF 1, at 2–3 ¶ 6 n.1. According to Plaintiffs, a key premise of the Consent Decree was that BPD "must first endeavor to police itself by focusing on officer misconduct through transparency and fairness of internal investigations, and the avoidance of conflicts of interest in conducting those investigations." *Id.* The Consent Decree required that the Court appoint a Monitor to "assess and report on whether the requirements of [the Consent Decree] have been implemented and provide Technical Assistance in achieving compliance." Consent Decree ¶ 442.[5] The Consent Decree also

---

[4] The Consent Decree was filed in *United States v. Baltimore City Police, et al.*, JKB-17-0099 at ECF 2-2.

[5] In the Motion, Defendant indicates that the Consent Decree is attached as Exhibit 1. ECF 22-1, at 1 n.1. However, there do not appear to be any exhibits attached to the Motion, besides the proposed order. Nonetheless, the Court will take judicial notice of the Consent Decree filed at ECF 2-2 in *United States v. Baltimore City Police, et al.*, JKB-17-0099, because it is a publicly

3

stated that the Monitor will be "the agent of the Court." *Id.* ¶ 445. Under the plain language of the Consent Decree, the Monitor will "not . . . replace or assume the role and duties of the City or BPD, or any duties of any City or BPD employee, including the Commissioner, or any City official." *Id.* The Consent Decree also states that the Monitor "will not investigate [misconduct] reports, but will convey the information regarding the complaint to Internal Affairs . . . and may track the complaint investigation to ensure it is handled appropriately." *Id.* ¶ 475. Additionally, the Consent Decree states that "the Monitor will not be liable for any claim, lawsuit, or demand arising out of and substantively related to the Monitor's performance pursuant to [the Consent Decree] brought by non-parties to [the Consent Decree]." *Id.* ¶ 480.

On October 3, 2017, Judge Bredar appointed Kenneth Thompson to be the Lead Monitor for the Consent Decree, a position that he continues to hold. ECF 1, at 4–5 ¶ 12. Kenneth Thompson is an attorney and a partner at the law firm Venable, LLP. *Id.* In January of 2023, Commissioner Michael Harrison[6] allegedly "enlisted Mr. Thompson to oversee the internal affairs investigations which are relevant to this complaint." *Id.* Specifically, Thompson was assigned to oversee the investigative process of case numbers 2022-0156 and 2022-0347. Case 2022-0156 involved Raquel Lilly's formal complaint of misconduct against Lieutenant Colonel Jack Herzog

---

filed document and neither party disputes its accuracy. *See* Fed. R. Evid. 201 (a court may take judicial notice of a fact "that is not subject to reasonable dispute" if it "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned"); *see also Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 503 (D. Md. 2019) ("[C]ourts may take judicial notice of publicly available records without converting a motion to dismiss to a motion for summary judgment."). Further, both parties rely on the Consent Decree. As will be discussed further below, the Court also finds that the Consent Decree may be considered integral to the Complaint.

[6] According to the Complaint, in his capacity as Police Commissioner, "Defendant Harrison oversaw all aspects of BPD including its efforts to comply with the Consent Decree." ECF 1, at 2 ¶ 6.

and Deputy Commissioner Sheree Briscoe, which was filed in February 2022. *Id.* at 8 ¶¶ 34, 35. Case 2022-0347 involved a formal complaint filed by Robert and Delphine Smith, Raquel Lilly's aunt and uncle, against Jeffrey Lilly over a dispute related to the puppies. *Id.* at 10 ¶ 47.

According to the Complaint, Commissioner Harrison "took the extraordinary action[7] of assigning [Thompson]" to "monitor the investigative process and ensure transparency and fairness throughout the process." *Id.* at 16 ¶ 81. Commissioner Harrison allegedly testified that "he assigned Mr. Thompson to oversee the cases and that [his] expectations of Mr. Thompson [were] to bring credibility to [the] process, as he was the Consent Decree monitor[,] and this had become a high-profile matter which got a lot of media attention, even the attention of the court overseeing our Consent Decree." *Id.* ¶ 83 (cleaned up). Additionally, Thompson was allegedly assigned to oversee the investigation because "being the monitor," he had "unfettered access and doesn't need permission . . . or a set of keys to enter the buildings and to go anywhere [or] to do anything and to compel anybody to provide information."[8] *Id.* ¶ 84. Plaintiffs further allege that "[i]n this capacity and in his capacity as Monitor of the Consent Decree, Thompson made decisions directly impacting the relevant internal affairs investigations and those decisions were prejudicial to the rights of the Plaintiffs." *Id.*

Ultimately, Director Akanni allegedly gave instructions to BPD detectives to close the cases "without conducting any interviews." ECF 1, at 18–19 ¶ 96. According to Plaintiffs,

---

[7] When questioned, Commissioner Harrison allegedly "could not recall any other time where a member of the DOJ Monitoring Team was assigned to have any involvement with an active investigation." ECF 1, at 16 ¶ 82.

[8] Thompson allegedly had "unfettered access to the people, facilities, and files of the BPD to enable his oversight of BPD's efforts to come into compliance with the Consent Decree and enable him to ensure that BPD conducted thorough, fair, and timely internal investigations." ECF 1, at 4–5 ¶ 12.

Thompson "failed to prevent Director Akanni's actions, failed to ensure that the investigations were properly conducted and contributed to the violation of the Plaintiffs' rights." *Id.*

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

The Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted)

(emphasis omitted). Because Thompson's only connection to this litigation is through his role as a court-appointed monitor of the Consent Decree and the Consent Decree contains an express provision providing Thompson with quasi-judicial immunity, the Court will consider the Consent Decree as an integral document.

## III. ANALYSIS

The Consent Decree, which was implemented in a previous case, required that the Court appoint a Monitor to "assess and report on whether the requirements of [the Consent Decree] have been implemented and provide Technical Assistance in achieving compliance." Consent Decree ¶ 442. The Consent Decree stated that the Monitor was "the agent of the Court." *Id.* ¶ 445. Because of the nature and function of his role, Thompson argues that he is "immunize[d] . . . from the type of lawsuit Plaintiffs have now brought against him." ECF 22-1, at 3.

"Judicial immunity does not protect *judges* so much as it protects the judicial acts they undertake as part of their public service; it is 'defined by the *functions* it protects and serves, not by the person to whom it attaches.'" *Gibson v. Goldston*, 85 F.4th 218, 223 (4th Cir. 2023) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988) (emphasis in original)). "As such, judges are not protected if they act in the 'clear absence of all jurisdiction over the subject-matter' or when they engage in nonjudicial acts." *Id.* (quoting *Bradley v. Fisher*, 80 U.S. 335, 351 (1872) and *Stump v. Sparkman*, 435 U.S. 349, 359 (1978)). For example, in *Gibson v. Goldston*, the Fourth Circuit declined to extend judicial immunity to a state court judge who personally participated in the search of plaintiff's home after the plaintiff's ex-wife complained that plaintiff had failed to turn over some items as part of a property-distribution settlement ordered in a divorce decree. 85 F.4th at 221. The Fourth Circuit explained that after considering "the functions of the judicial and executive branches, it becomes clear that—on the facts at bar—[the judge] engaged

7

in acts not normally performed by judges and in so doing forfeited the protection of judicial immunity." *Id.* at 225.

Meanwhile, absolute immunity extends to "quasi-judicial" actors "whose duties are comparable to those of judges . . . when adequate procedural safeguards exist." *Ostrzenski v. Seigel*, 177 F.3d 245, 249 (4th Cir. 1999). "Whether an act is judicial 'relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge.'" *Gibson*, 85 F.4th at 225 (quoting *Stump*, 435 U.S. at 362). In this case, the nature of the act is more accurately characterized as a failure to act. Plaintiffs allege that Thompson was assigned by Commissioner Harrison to "monitor the investigative process and ensure transparency and fairness throughout the process" of BPD's investigation of Plaintiffs' misconduct complaints. ECF 1, at 16 ¶ 81. This is quintessentially a judicial function and mirrors Thompson's role in the Consent Decree as an oversight monitor. Plaintiffs take issue with how Thompson carried out, or allegedly failed to carry out, this responsibility, as Plaintiffs contend that Thompson "failed to prevent Director Akanni's actions, failed to ensure that the investigations were properly conducted and contributed to the violation of the Plaintiffs' rights." *Id.* at 18–19 ¶ 96.

Despite Plaintiffs' attempts to distinguish the case, ECF 27, at 7–8, *Mahoney v. Holder* is squarely on point with the case at bar. There, in an earlier lawsuit, the Department of Justice ("DOJ") sued the City of Seattle for their allegedly unconstitutional pattern or practice of excessive use of force. 62 F. Supp. 3d 1215, 1217 (W.D. Wash. 2014). As a condition of settlement, the City of Seattle agreed to create new policies aimed at preventing the pattern and practice alleged by the DOJ. *Id.* The court appointed a monitor as "an agent of the court to assist in the policy-drafting process, among other tasks." *Id.* Individual officers then brought a separate lawsuit alleging, *inter alia*, that "while [the monitor] agreed it was not his role to write the Policy, the

Policy was altered almost in its entirety and replaced with specific language provided, and required, by the [m]onitor." *Id.* at 1220 (cleaned up). In response, the monitor asserted that the claims against him must be dismissed because "he has absolute quasi-judicial immunity from suit in his role as a [m]onitor." *Id.* at 1219. In evaluating immunity, the court explained that "even if [the monitor] engaged in the conduct Plaintiffs assign to him, he was engaged in an essential judicial function: that of resolving a dispute between the parties to the City of Seattle litigation at the request of a federal district court judge." *Id.* at 1220. Additionally, the court pointed out that the function involved discretion, and the monitor was not "constrained to take a single course of action with respect to the drafting of the policy," and thus that distinguished the function of the monitor from other actors who are not entitled to quasi-judicial immunity because they are not afforded discretion in carrying out their duties. *Id.* at 1221. The court ultimately held that because the monitor "exercised discretion in resolving a dispute at the request of a district judge," he was entitled to absolute quasi-judicial immunity. *Id.*

So too here. Thompson was appointed by a federal court as an independent monitor, and he exercised discretion in overseeing misconduct complaints and investigations at BPD to ensure they were handled properly. The fact that Thompson did not oversee the investigations in the way Plaintiffs preferred does not strip Thompson of his quasi-judicial immunity. As the Fourth Circuit explained in *Gibson*, "the Supreme Court recognized that it was 'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself,'" 85 F.4th at 223 (citing *Bradley*, 80 U.S. at 347), and "[s]uch a freedom would be illusory if judges could be haled into court by every disappointed litigant," *id.*

9

Even assuming, solely for the purposes of deciding the Motion, that Commissioner Harrison had authority to make a case assignment to Thompson and further assuming that Thompson failed to effectively monitor the investigations, the nature of that act is wholly related to Thompson's role as a court-appointed monitor of the Consent Decree. *See* ECF 1, at 4–5 ¶ 12 ("In this capacity and in his capacity as Monitor of the Consent Decree, Defendant Thompson made decisions directly impacting the relevant internal affairs investigations and those decisions were prejudicial to the rights of the Plaintiffs."). Plaintiffs' claims relate entirely to Thompson's role as a court-appointed monitor because his alleged actions (or rather, inaction) were completed for the purpose of assisting the court in determining compliance with the Consent Decree. Without the Consent Decree, Thompson would have no oversight authority whatsoever into any BPD investigation. Indeed, the Complaint states that Commissioner Harrison assigned Thompson to oversee the investigation because "being the monitor," Thompson had "unfettered access to everything in the agency, every facility, and has access—unfettered access and doesn't need permission . . . or a set of keys to enter the buildings and to go anywhere [or] to do anything and to compel anybody to provide information." *Id.* at 16–17 ¶ 84.

What is more, the Consent Decree outlines the role of the court-appointed monitor, and expressly states that "the Monitor will not be liable for any claim, lawsuit, or demand arising out of and substantively related to the Monitor's performance pursuant to [the Consent Decree] brought by non-parties to [the Consent Decree]." Consent Decree ¶ 480. As Thompson aptly puts it: "[he] is only involved in this case because he was the Monitor, and acting under that position necessarily involves discretion, not rote, ministerial tasks." ECF 31, at 6.

The Court is unpersuaded by Plaintiffs' reliance on *McCray v. State of Maryland* because that case involved a court clerk whose alleged negligence "impeded the filing of [a prisoner's]

10

petition for state postconviction relief." 456 F.2d 1, 2 (4th Cir. 1972). In declining to extend quasi-judicial immunity, the Fourth Circuit held that "the clerk has no discretion that merits insulation by a grant of absolute immunity," because "[c]lerical duties are generally classified as ministerial, and the act of filing papers with the court is as ministerial and inflexibly mandatory as any of the clerk's responsibilities." *Id.* at 4 (internal citation omitted). By contrast, here, Plaintiffs' allegations reveal the discretionary nature of Thompson's role. *See* ECF 1, at 16 ¶ 81 (alleging that Commission Harrison assigned Thompson to "monitor the investigative process and ensure transparency and fairness throughout the process"); *see also id.* at 4–5 ¶ 12 (alleging that Thompson had "unfettered access to the people, facilities, and files of the BPD to enable his oversight of BPD's efforts to come into compliance with the Consent Decree and enable him to ensure that BPD conducted thorough, fair, and timely internal investigations"). Oversight of investigatory processes and review of compliance efforts are not "ministerial act[s]." *Cf. McCray*, 456 F.2d at 4. Such a role necessarily encompasses "a discretion similar to that exercised by judges." *Id.* at 3. Accordingly, Thompson functioned as an "arm of the court," performing discretionary duties—namely, oversight of BPD investigations—as a court-appointed monitor. *Crane v. Hudson*, No. 19-cv-00421, 2019 WL 5290538, at *4 (S.D. W. Va. Sept. 23, 2019); *see also* Consent Decree ¶ 445 (stating that the Monitor was "the agent of the Court").

Plaintiffs attempt to argue in their response in opposition to the Motion that immunity should not apply because Thompson exceeded his authority as a monitor by "tak[ing] on an additional role and act[ing] as an agent of BPD in a manner akin to that of a commanding officer that supervises active investigations."[9] ECF 27, at 7 (emphasis removed). According to Plaintiffs,

---

[9] The Court notes that under the Consent Decree, the monitor does "not . . . replace or assume the role and duties of the City or BPD, or any duties of any City or BPD employee, including the Commissioner, or any City official." Consent Decree ¶ 445; *see also id.* ¶ 475 (noting that with

11

this was a "task far beyond his limited scope as the DOJ Monitor, and thus any activities pertaining to that assignment are not shielded by quasi-judicial immunity." *Id.* at 3. In response, Thompson argues that "[t]he test for quasi-judicial immunity is whether the conduct alleged was a judicial function . . . [i]t is not, as Plaintiffs assert, a question of whether the official in question did or did not exceed his authority." ECF 31, at 5 (citing *Gibson*, 85 F.4th at 223). As a threshold matter, judicial immunity applies even to judicial acts "flawed by the commission of grave procedural errors," *Stump*, 435 U.S. at 359, and protects even actions "alleged to have been done maliciously or corruptly," *Bradley*, 80 U.S. at 351, so long as the act does not "clearly exceed[] the most common understandings of the proper judicial role," *Gibson*, 85 F.4th at 223. In *Mahoney*, the court found that even assuming the monitor "seized control over the [policy] drafting process," which allegedly exceeded his limited role of merely ensuring the proposed policies' conformity with the requirements of the Consent Decree, the court nonetheless found that this act did not "deprive[] him of quasi-judicial immunity for his role in the process." *Mahoney*, 62 F. Supp. 3d at 1220. While *Mahoney* is not binding precedent, the Court sees no reason to depart from its reasoning given the factual similarities to the instant case. The allegations against Thompson all arise out of or are related to his role as the Independent Monitor, and the conduct he is alleged to have engaged in—failing to properly oversee the investigations of the complaints at issue—is a function that is judicial in nature. Thus, Thompson is entitled to quasi-judicial immunity. Further, as stated above, the plain language of the Consent Decree expressly protects Thompson from "any claim, lawsuit, or demand arising out of and substantively related to the Monitor's performance

---

respect to misconduct complaints reported to the Monitor, the Monitor "will not investigate these reports, but will convey the information regarding the complaint to [BPD's Public Integrity Bureau] . . . and may track the complaint investigation to ensure it is handled appropriately"). For the purposes of the Motion, the Court takes as true Plaintiffs' allegation that Thompson took on an additional role beyond the role laid out in the Consent Decree.

pursuant to [the Consent Decree] brought by non-parties to [the Consent Decree]." Consent Decree ¶ 480. As such, Thompson is entitled to absolute immunity based on the relevant case law and the plain language of the Consent Decree.[10]

## IV.   CONCLUSION

For the foregoing reasons, Thompson's Motion to Dismiss, ECF 22, is granted.

A separate implementing Order will issue.

Dated: June 17, 2025

/s/
Brendan A. Hurson
United States District Judge

---

[10] Because Thompson is entitled to absolute quasi-judicial immunity, the Court declines to reach Defendant's remaining arguments that Plaintiffs failed to state a claim and relied on improper group pleading. *See generally* ECF 22-1.

13