**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| JEFFREY LILLY ET AL., | | |
| | * | |
| Plaintiffs, | | |
| | * | |
| v. | | |
| | * | Civil No. 25-00240-BAH |
| MICHAEL HARRISON ET AL., | | |
| | * | |
| Defendants. | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

In this action, Jeffrey Lilly and Raquel Lilly (collectively "Plaintiffs") brought suit against Baltimore Police Department ("BPD") Commissioner Michael Harrison, Deputy Commissioner Brian Nadeau, Olufemi Akanni (Director of the BPD's Equal Opportunity and Diversity Section ("EODS")), Major Jason Callaghan, Captain Lamar Howard, and Lieutenant Daniel Popp (collectively, "Defendants")[1] alleging a § 1983 claim (Count I), a § 1985 claim (Count II),[2] and a § 1986 claim (Count III) against all Defendants, as well as a malicious prosecution claim against Lieutenant Popp (Count IV).  ECF 1. Now pending before the Court are (1) Plaintiffs' motion to consolidate this action (*Lilly II*) with *Lilly et al. v. Baltimore Police Department et al.*, Civ. No. 22-2752-BAH (D. Md. filed Oct. 26, 2022[3]) (*Lilly I*), ECF 24 (motion) and ECF 25 (memorandum

---

[1] The Court previously granted the motion to dismiss filed by Kenneth Thompson.  *See* ECF 41 (memorandum opinion); ECF 42 (order).

[2] Plaintiffs bring this claim pursuant to subsection (3) for deprivation of rights or privileges.  *See* ECF 1, at 1 ¶ 1 (specifying § 1985(3)); *id.* at 22 ¶ 113 (alleging that Defendants "conspire[d] for the purposes of depriving . . . the Plaintiffs of their rights").

[3] *Lilly I* was initially filed in state court and removed to this Court by the defendants.  *See Lilly I*, ECF 1.  The date referenced is the date the case was removed to this Court.

in support of motion); (2) Defendants' motion to dismiss Jeffrey Lilly's complaint, ECF 32; and (3) Defendants' motion to dismiss Raquel Lilly's complaint, ECF 33.  Each motion is ripe for this Court's review.  *See* ECF 34 (Defendants' opposition to motion to consolidate); ECF 37 (Plaintiffs' consolidated opposition to motions to dismiss[4]); ECF 40 (Defendants' consolidated reply to motions to dismiss).[5]  At the Court's request, the parties also provided their respective positions on how the Court's order granting summary judgment to the BPD and granting partial summary judgment to Defendants Delphine Smith, Robert Smith, and Lekeshia Blue in *Lilly I* impacted the motion to consolidate the cases.  *See* ECF 43 (Court's letter order); ECF 44 (Defendants' response); ECF 45 (Plaintiffs' response).

All motions include memoranda of law, the motion to dismiss Jeffrey Lilly's complaint contains exhibits, and Plaintiffs' consolidated opposition incorporates the exhibits attached to ECFs 75 and 87 in *Lilly I*.[6]  The Court has reviewed all relevant filings and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2025).  Accordingly, for the reasons stated below, the motion to consolidate is DENIED and the motions to dismiss are GRANTED.

## I.    **BACKGROUND**

Much of this background repeats what the Court has written in prior opinions in *Lilly I* and in this action.  The Court includes here the facts necessary to give context to the pending motions, if somewhat repetitive, for completeness and clarity.

---

[4] Plaintiffs also ask the Court to consider converting Defendants' motions to dismiss into motions for summary judgment.  *See* ECF 37, at 6.

[5] Plaintiffs did not file a reply regarding the motion to consolidate.

[6] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.  Unless otherwise noted, ECF citations refer to docket entries in this case.  Citations to docket entries in *Lilly I* are identified as such.

Plaintiff Jeffrey Lilly has been employed by the BPD in Baltimore City, Maryland, since 2004.  ECF 1, at 2 ¶ 3.  His wife, Raquel Lilly, is from a "prominent police family," and many of her family members are also current or former members of the BPD.  *Id.* ¶ 4.  The Lillys breed and sell French and English bulldogs through their business named Twisted Roots Kennels.  *Id.* ¶ 5.

The underlying factual allegations in this complaint and the *Lilly I* complaint relate to a familial dispute between the Lillys and Raquel Lilly's cousin (Lekeisha Blue), aunt (Delphine Smith), and uncle (Robert Smith) (collectively "the Smiths"), who are defendants in *Lilly I*.  The dispute centers on who, the Lillys or the Smiths, was entitled to physical possession of puppies bred by Twisted Roots Kennels, and later, who was entitled to sell the puppies and retain the proceeds.  *See* ECF 1, at 5–10.  At its core, the complaint alleges that Defendants, who are all employed by the BPD, mishandled the investigation of Plaintiffs' Public Integrity Bureau ("PIB") complaint, which alleged misconduct by PIB officials in responding to the familial dispute.  *Id.* at 7–16.

Given the arguments presented in the motions, the Court finds it necessary to repeat its summary of the factual allegations in *Lilly I*:

> In October 2020, James Blue and the Lillys allegedly entered into a contract (the "Contract") whereby James Blue purchased a dog for $8,500.00 for the purpose of producing a litter of puppies in cooperation with Twisted Root Kennels.  The Contract provided that James Blue was to receive sixty percent of the proceeds from the sale of the litter, with the Lillys having first pick of the litter for future breeding efforts prior to any sale. The Contract further stated that the Lillys "are solely responsible and are the only authority of the brand, stock, product, revenue and intentions of [Twisted Roots Kennels]," with "[t]he monetary investment made by James Blue[] giv[ing] no rights or responsibilities to any part, procedure, profit (with the exception of the agreed terms of the return of investment), opportunities, operations, other partnerships, entities, or umbrella companies of [Twisted Roots Kennels]."
>
> Beginning in late December 2021, James Blue was in possession of a litter of five French bulldog puppies bred in accordance with the Contract.  On January 25, 2022, James Blue was sitting in his car when Sahiou Kargbo ("Kargbo") approached his car and began shooting.  At the time of the shooting, the Baltimore

Police Department had two outstanding warrants for Kargbo's arrest but had not yet arrested him.

James Blue was transported to and later declared dead at Johns Hopkins Hospital. Several of the parties involved in this litigation, including the Lillys, joined the Blue family at the hospital. Family and friends, including the Lillys, then gathered at the home of Robert and Delphine Smith. Before the Lillys left the Smith residence on January 25, 2022, the Lillys spoke with Lekeshia Blue and Jadan Blue and requested that the puppies be cared for until they could be returned to the Lillys. The Lillys contend that all parties agreed to this arrangement.

During a telephone conversation on January 27, 2022, Jadan Blue informed Jeffrey Lilly that Lekeshia Blue, Robert Smith, and Delphine Smith "had decided to keep the puppies permanently." The Lillys contend that they made several additional attempts to arrange for the return of the litter. After several unsuccessful attempts, the Lillys contacted non-emergency police services on January 30, 2022, but the Blue and Smith families continued to refuse to return the litter.

The Lillys allege that the Baltimore Police Department began a "pressure campaign against Jeffrey Lilly." Specifically, the Lillys allege that, between January 31, 2022 and February 8, 2022, Jeffrey Lilly was contacted by or spoke to several members of the Baltimore Police Department, all of whom encouraged the Lillys to abandon the pursuit of their property, and a formal complaint made regarding such contact went unanswered. A summary of the alleged pressure campaign follows.

Jeffrey Lilly alleges that he was contacted by Lieutenant Colonel John Herzog ("Herzog") of the Detectives Division of the Baltimore Police Department on January 31, 2022. According to the Lillys, Herzog advised Jeffrey Lilly that Deputy Commissioner Sheree Briscoe ("Briscoe") of the Operations Bureau asked him to contact the Lillys on behalf of Robert Smith to request that the Lillys "stop bothering them."

On February 2, 2022, a former colleague of Jeffrey Lilly contacted him and advised him "that someone had informed the FBI that Mr. Lilly was conducting his kennel business on department time and that the FBI was about to initiate an investigation against him." Later that same day, Jeffrey Lilly met with Detective Jared Stern ("Stern") at the FBI's field office in Baltimore. During that meeting, Jeffrey Lilly informed Stern about the phone call he had received earlier that morning and explained the civil dispute between the Lilly, Blue, and Smith families. Also on February 2, 2022, Raquel Lilly filed a formal complaint with the [PIB] alleging that Herzog and Briscoe "had inappropriately interfered in a private family matter and that interference was creating a hostile work environment for Mr. Lilly."

On February 7, 2022, Deputy Director Olufemi Akanni ("Akanni") of the Equal Opportunity and Diversity Section of the Baltimore Police Department notified Jeffrey Lilly that Deputy Commissioner Brian Nadeau of the PIB wanted to speak with him privately. The next day, Jeffrey Lilly, Akanni, and Nadeau met at Baltimore Police Department headquarters. Jeffrey Lilly alleges that Nadeau "repeatedly attempted to intimidate Mr. Lilly into abandoning the pursuit of his

property and ending his efforts to enforcing the contract," and further "admitted to taking a back-channel complaint from Robert Smith."

In March 2022, the Lillys retained counsel to try and enforce the Contract. On March 10, 2022, counsel for Plaintiffs sent a demand letter via certified mail to the Smiths and Lekeshia Blue, demanding the immediate return of the litter. The litter was never returned, and Plaintiffs were unable to complete three contracts for buyers that had made deposits for puppies from this litter.

On March 25, 2022, Jeffrey Lilly received written notification from Major Jason Callaghan that he was the subject of an internal investigation being conducted by the PIB. According to Plaintiffs, the letter claimed that Jeffrey Lilly "'harassed [the Smith] family during the time of January 2022 and February 2022'" and "provided 'false information to Baltimore County Police.'" Plaintiffs allege that the complaint was initiated by the Smith family.

On April 13, 2022, Jeffrey Lilly contacted his union attorney, Michael Davey ("Davey") regarding representation during the PIB complaint process. After Davey learned that the complaint against Jeffrey Lilly involved current and former high-ranking officers of the PIB and Raquel Lilly's related complaint, Davey requested a change of venue. The request was denied via an email from Nadeau. Jeffrey Lilly's initial interrogation was subsequently scheduled for April 26, 2022. While PIB policy mandated that the time and place of the interrogation remain confidential, Plaintiffs allege that Lekeshia Blue and Nadeau informed Delphine Smith of the details of the upcoming interrogation.

On April 25, 2022, Delphine Smith appeared before a Baltimore County Commissioner and swore out a criminal charge of forgery of a private document against Jeffrey Lilly. Prior to his initial interrogation on April 26, 2022, BPD served Jeffrey Lilly with a criminal summons for the forgery charges. Upon advice of counsel, Jeffrey Lilly refused to make any statements and left the interrogation.

On April 27, 2022, Jeffrey Lilly received notice that he was being suspended without pay and benefits. On May 4, 2022, Jeffrey Lilly appeared before members of the PIB to determine if his suspension would continue to be unpaid. After Jeffrey Lilly presented evidence of his business relationship with James Blue, Captain Michael Newton of the PIB upheld the decision to suspend Jeffrey Lilly without pay.

On June 7, 2022, Jeffrey Lilly alleges that he "gained insight regarding [Nadeau's] and the BPD's intimidation when he received a photograph via text message from another BPD officer." The photograph was of a letter sent to the Office of Legal Affairs at BPD by an attorney dated May 31, 2022, which notified BPD of James Blue's family's intent to sue the BPD for wrongful death.

On June 9, 2022, Jeffrey Lilly appeared before the District Court of Baltimore County regarding the forgery charges. The Baltimore County State's Attorney entered a nolle prosequi, dismissing the charges. The Lillys allege that immediately after the court proceeding, the Smith and Blue family demanded to speak to the Assistant State's Attorney regarding her decision to drop the charges, and when Lekeshia Blue saw the Lillys in the court hallway, she screamed profanities at Raquel Lilly.

On June 14, 2022, Jeffrey Lilly was informed that his suspension would be lifted, and his policing powers and compensation reinstated.  On June 17, 2022, the Lillys reported to the PIB office located in the Baltimore Police Department headquarters to sign Jeffrey Lilly's reinstatement paperwork.  Jeffrey Lilly alleges that after he signed the paperwork, he was told that in order to receive his backpay, "he would have to disclose all of his financial records, waive any claims against the BPD, and indemnify the BPD from all claims, damages, losses, and expenses arising out of his disclosure."  Thereafter, Jeffrey Lilly declined to sign the Authorization for Release of Financial Information.  Before leaving the PIB office, the Lillys inquired about Raquel Lilly's February 2, 2022 complaint, which the Lillys allege was stalled by Lekeshia Blue and Nadeau.

On June 21, 2022, Jeffrey Lilly contacted Supervisory Special Agent Adonis Wesbey ("Wesbey") to inquire whether he would be returning to the unit as a Task Force Officer.  On June 28, 2022, Wesbey indicated via text message that the FBI wanted him to return, noting that she had left Lieutenant Billy Simmons ("Simmons") of the BPD a message stating the same.  Later that same day, Simmons stated that Jeffrey Lilly was being reassigned to the Warrant Apprehension Task Force.  According to Jeffrey Lilly, this assignment would require him to be under the direct supervision of Lamont Pride, who is Lekeshia Blue's brother and a sergeant assigned to that unit. Jeffrey Lilly requested another assignment.

On August 4, 2022, Lekeshia Blue was promoted to the rank of Captain, effective August 7, 2022.  The Lillys allege that Lekeshia Blue's promotion was "in contravention of departmental policy because there was an open complaint, filed by Raquel Lilly, involving the actions of Lekeshia Blue."

*Lilly I*, ECF 34, at 6–11 (internal citations omitted); *see also Lilly I*, ECF 24 (amended complaint).

On September 13, 2022, the Lillys and Twisted Roots Kennels brought *Lilly I* against the BPD, Brian Nadeau, Lekeisha Blue, Robert Smith, Delphine Smith, and unknown BPD employees.  *See Lilly I*, ECF 1 (notice of removal), ECF 2 (state court complaint), ECF 24 (amended complaint).  Robert and Delphine Smith filed answers, but the BPD defendants (including the BPD, Deputy Commissioner Nadeau, Captain Blue, and the unknown BPD employees) moved to dismiss.  *See Lilly I*, ECF 21 (Delphine Smith's answer), ECF 22 (Robert Smith's answer),  ECF 25 (BPD defendants' motion to dismiss).  As relevant to the BPD

defendants, the Court[7] dismissed with prejudice the § 1983 claim against the BPD "for its policy and practice of mishandling investigations conducted by the Public Integrity Bureau," the civil conspiracy claims for tortious interference with a contract and abuse of process, the tortious interference with a contract claim against Deputy Commissioner Nadeau, the intentional infliction of emotional distress claim, and the claim for recovery of unpaid wages. *Lilly I*, ECF 34, at 3. The Court also dismissed the abuse of process retaliation, and indemnification claims because Plaintiffs withdrew them.[8] *Id.* The Court declined to dismiss the § 1983 claim against the BPD "for Brian Nadeau's alleged malicious abuse of the Public Integrity Bureau's investigative and disciplinary process" and the conversion claim against Lekeisha Blue. *Id.* at 4. All claims against the Smiths survived, as they did not move to dismiss. *See id.* at 3–4.

As to the remaining § 1983 claim, the Court noted that "Plaintiffs' factual allegations and assertions . . . [were] far from clear," but "construe[d] Plaintiffs' claim in Count 1 to mean that Nadeau's actions infringed upon Plaintiffs' liberty to contract."[9] *Id.* at 21. The Court expressly noted that it "construe[d] this count] as brought only against" the BPD, and that "[i]f Plaintiffs intended to assert [this § 1983 claim] against Defendant Brian Nadeau in his individual capacity, they may move this Court for leave to amend their pleadings to state as such." *Id.* at 29 n.15. The Court then entered its initial scheduling order setting the deadline to amend the pleadings and join parties as February 2, 2024. *Lilly I*, ECF 44, at 2. While the parties asked to extend other deadlines,

---

[7] *Lilly I* was previously assigned to Judge Bennett, who issued the memorandum opinion and order on the motion to dismiss the amended complaint. *See Lilly I*, ECFs 34 and 35.

[8] Plaintiffs also withdrew their claims against Defendants Unknown Employees of BPD, "reserv[ing] the right to seek leave to further amend the complaint, adding individuals or claims, should facts be uncovered in discovery that warrant said amendments." *Lilly I*, ECF 26, at 6.

[9] The Court also expressed its "mindful[ness] that ultimately considerably more will be necessary to establish liability under § 1983" than what Plaintiffs had pled. *Lilly I*, ECF 34, at 23.

they did not ask to extend the amendment/joinder deadline. *See Lilly I*, ECFs 46, 48, 51, 57, and 62.

In mid-January 2025, the BPD and the Smiths (including Captain Blue) moved for summary judgment. *See Lilly I*, ECFs 67 and 68. In June 2025, the Court granted the BPD's motion for summary judgment, *see* ECFs 92 and 93, and granted in part and denied in part the Smiths' motion for summary judgment, *see* ECFs 90 and 91. The surviving counts in *Lilly I* include tortious interference with a contract (Count VI) against Robert and Delphine Smith, civil conspiracy for tortious interference with a contract (Count III) against Captain Blue, and the Smiths, and conversion (Count V) against Captain Blue and the Smiths. *See Lilly I*, ECFs 91 and 93.

While the motions for summary judgment were pending in *Lilly I*, Plaintiffs brought *Lilly II* on January 27, 2025. ECF 1. The allegations overlap significantly. Defendants Commissioner Harrison, Deputy Commissioner Nadeau, Director Akanni, and Major Callaghan, now named individually, are all referenced in the operative *Lilly I* complaint. *See generally Lilly I*, ECF 24. Plaintiffs' allegations here recount the puppy breeding contract with James Blue in October 2020, the birth of the litter of puppies in late 2021, James Blue's tragic passing in January 2022, and the Smiths' decision to keep the litter of puppies. ECF 1, at 4–7 ¶¶ 15–28. Plaintiffs recount the call Jeffrey Lilly received from Herzog on January 31, 2022, other allegedly "intimating" "communications from superior officers within his direct chain of command," and the report that Jeffrey Lilly was being investigated by the FBI. *Id.* at 7–8 ¶¶ 29–33.

The complaint also includes the PIB complaint Raquel Lilly filed against Herzog and Briscoe, but unlike the complaint in *Lilly I*, it specifically references the case number: PIB complaint number 2022-0156. *Id.* at 8 ¶¶ 34–35. Plaintiffs include slightly more detail about the

assignment of the complaint to Director Akanni of EODS: "Director Akanni later admitted that despite the conflict [with PIB], he communicated with Deputy Commissioner Nadeau about the investigation and received direction from Deputy Commissioner Nadeau regarding his investigative steps." *Id.* ¶ 36. The complaint again details the February 8, 2022 meeting Jeffrey Lilly had with Deputy Commissioner Nadeau and Director Akanni. *Id.* at 8–9 ¶¶ 37–40. Plaintiffs now allege, based on a December 5, 2024 deposition with Commissioner Harrison, that Harrison made the decision to assign PIB complaint 2022-0156 to Director Akanni of EODS "because of the obvious conflict within PIB"[10] and that pursuant to a memorandum of understanding with the Office of the Inspector General ("OIG"), he would refer all complaints made against him or his executive team to OIG. *Id.* at 9–10 ¶¶ 43–44. Despite Deputy Commissioner Briscoe being a member of the executive team, Commissioner Harrison did not refer the complaint to OIG. *Id.* ¶ 44.

This complaint also contains more details about the PIB complaint the Smiths made against Jeffrey Lilly, PIB complaint number 2022-0347. *See id.* at 10–12 ¶¶ 47–55. Plaintiffs allege "[o]n information and belief" that Lieutenant Popp destroyed a recording of the statement the Smiths made to Popp and Detective Bowling, who also worked in PIB. *Id.* at 10 ¶ 48. In March 2022, Lieutenant Popp emailed Captain Howard to inform him that several PIB officers "were uncomfortable investigating complaint 2022-0347 because the allegations involved superiors within PIB" and because the PIB Manual "precluded" their involvement. *Id.* ¶ 50. The next day, Major Callaghan emailed Captain Howard, Lieutenant Popp, and non-party Sergeant Kenneth

---

[10] Plaintiffs do not explain in the *Lilly II* complaint what this "obvious conflict" is. Jeffrey Lilly reported to Detective Jared Stern that "he didn't feel comfortable reporting his concerns to PIB because the dispute involved Lieutenant Blue and her family," ECF 1, at 8 ¶ 33, but one must reference the *Lilly I* complaint to understand that, at the time, Lekeisha Blue was "a BPD officer assigned to the PIB," *Lilly I*, ECF 24, at 3 ¶ 9.

Williams "ordering them to advise him of when Detective Lilly would be interviewed and to thereafter provide him with an audio file of the interview and written summary." *Id.* at 11 ¶ 51. At an October 2024 deposition, Lieutenant Popp testified that "he was following orders to keep the investigation under his control." *Id.* ¶ 52. "On information and belief, Captain Howard ordered Lieutenant Popp to maintain control of the investigation of complaint 2022-0347 to please the Smith Family and exert pressure over Jeffrey Lilly." *Id.* ¶ 53.

On March 29, 2022, Detective Bowling requested to be recused from investigating the complaint against Jeffrey Lilly.[11] *Id.* at 11–12 ¶ 54; ECF 1-1, at 10–11 (copy of Detective Bowling's request), at 13–14 (email containing request sent from Bowling to Kenneth Williams, Lt. Popp, Capt. Howard, and Maj. Callaghan). The investigations of PIB complaint numbers 2022-0156 and 2022-0347 were not then transferred outside PIB despite requests from the Lillys' representative.[12] *Id.* at 12 ¶¶ 55–58.

"On April 22, 2022, Lieutenant Popp disclosed the time and location of Jeffrey Lilly's initial interrogation to Robert Smith and Delphine Smith in a telephone conversation," which is meant to be confidential. *Id.* ¶¶ 59–60; ECF 1-1, at 27 (email from Lt. Popp to Capt. Howard stating "Smitty called me, and wanted an update on the investigation. I told him I was interviewing Lilly on Tuesday at 1000 hrs, but I was trying to farm the investigation out. I guess we will see what he says on Tuesday and then have to decide."). Plaintiffs allege that Lieutenant Popp "instructed Robert and Delphine Smith to file criminal charges for forgery," knowing "that a

---

[11] The recusal request appears to stem from Detective Bowling's understanding that Deputy Commissioners Briscoe and Nadeau had failed to adhere to reporting requirements (triggered by hearing criminal allegations made against another officer) by not authoring "Blue Team Reports" upon hearing Robert Smith's allegations of potentially criminal harassment by Jeffrey Lilly. *See* ECF 1-1, at 10–11.

[12] It is unclear whether Bowling's recusal request was granted.

forgery charge was a felony, that it would result in Jeffrey Lilly being suspended without pay, would disqualify him from serving as a Task Force Officer, and would derail Jeffrey Lilly's career." ECF 1, at 12–13 ¶¶ 60–61. Delphine Smith did so, emailing confirmation to Lieutenant Popp, who forwarded the email to Deputy Commissioner Nadeau, Major Callaghan, and Captain Howard. *Id.* at 13 ¶¶ 62–63. Jeffrey Lilly was then suspended without pay and was removed from an FBI task force. *Id.* ¶¶ 64–65. After a May 5, 2022 hearing, non-party Captain Michael Newton "upheld the decision to suspend Mr. Lilly without pay." *Id.* at 14 ¶ 67. Plaintiffs allege "[o]n information and belief" that Lieutenant Popp destroyed the recording of this hearing. *Id.* ¶ 68. Jeffrey Lilly's forgery charges were *nolle prossed* on June 9, 2022. *Id.* ¶ 70. Plaintiffs contend that had Lieutenant Popp followed PIB policy, he would have "sought the guidance of the relevant prosecuting agency" and "charges against Mr. Lilly would not have been approved and his career would not have been destroyed." *Id.* ¶ 71.

On the same day Plaintiffs filed *Lilly I*, September 13, 2022, a PIB detective contacted Raquel Lilly for the first time about her complaint, calling her directly rather than through her attorney as she had requested. *Id.* at 15 ¶ 73. On December 8, 2022, the BPD requested that the Baltimore County Police Department ("BCPD") investigate PIB complaints 2022-0156 and 2022-0347 due to the conflicts of interest. *Id.* ¶ 74. As part of the investigation, Deputy Commissioners Nadeau and Briscoe and Director Akanni were interviewed as witnesses. *Id.* ¶ 75. Director Akanni disclosed that he, Commissioner Harrison, and Deputy Commissioner Nadeau "immediately identified the conflict of interest in the two cases" but Director Akanni "was unable to give a clear answer as to why the cases had not been transferred earlier." *Id.* ¶ 77. Director Akanni explained that he "communicated with" Deputy Commissioner Nadeau about Raquel Lilly's complaint despite its assignment to EODS, not PIB, and that Major Callaghan instructed him "to cease all

investigative efforts." *Id.* at 15–16 ¶ 78.  After the investigations were transferred, BCPD then determined that it could not investigate the two complaints due to time constraints, so the case was returned to the BPD where Harrison reassigned the investigation to Director Akanni, with Thompson as a monitor to the investigation.[13]  *Id.* at 16 ¶¶ 79–81.

In early January 2023, Detective Mathis requested to be recused from Raquel Lilly's complaint (complaint number 2022-0156), but, "[o]n information and belief," Director Akanni "refused" to grant the request.  *Id.* at 17 ¶ 85; ECF 1-1, at 36 (recusal request).  Director Akanni then ordered that the cases be closed but "not to issue formal close-out letters to case respondents until they were told to do so."  ECF 1, at 17 ¶ 86.  A detective on PIB complaint 2022-0347, the complaint the Smiths made against Jeffrey Lilly, made a notation: "Advised by Director Akanni to not interview Captain Blue and Respondent Lilly. Advised to determine findings based on evidence. This is not the usual investigative process." *Id.* ¶ 87 (emphasis in original).  Detective Mathis then issued a report on Raquel Lilly's complaint concluding "until further information can be obtained the allegation of Inappropriate Workplace Conduct and Conduct unbecoming of a Police Officer is rendered a finding of **Unfounded**."  *Id.*  ¶¶ 88–89 (emphasis in original).  "Unfounded" means that "the investigation determines, by Clear and Convincing Evidence that the alleged misconduct did not occur or did not involve the employee under investigation."  ECF 1-1, at 40 (BPD General Disciplinary Process Policy 308).  "No interviews were conducted and no evidence was reviewed prior to Detective Mathis making his findings."  ECF 1, at 18 ¶ 92.  "On January 27, 2023, PIB complaint 2022-0156 was officially closed and a letter was sent to Mrs. Lilly [not her attorneys, despite her request] advising that the Defendants' investigation revealed

---

[13] As Thompson has been dismissed from this suit, *see* ECFs 41 and 42, the Court will not recount the allegations related to him.

that the available evidence did not meet the burden of proof necessary to sustain her allegations." *Id.* ¶ 94.

By contrast, "the investigative findings for the allegations against Jeffrey Lilly in 2022-0347 resulted in a finding of 'not sustained.'" *Id.* ¶ 95. "Not sustained" means that "the investigation is unable to determine, by a Preponderance of the Evidence, whether the alleged misconduct occurred." ECF 1-1, at 40. Plaintiffs contend that "[t]he difference  in the investigative findings was an intentional act meant to discredit Jeffrey and Raquel Lilly and protect high-ranking police officials." ECF 1, at 18 ¶ 95.

While many of the details of the investigations were not included in the operative *Lilly I* complaint, *see generally Lilly I*, ECF 24, the Court notes that they were assuredly part of the *Lilly I* record at the time of summary judgment, *see Lilly I*, ECF 92, at 5–16 (memorandum opinion on BPD's summary judgment motion).

Here, in Count I, Plaintiffs bring a § 1983 claim against all Defendants for "depriv[ation] of rights guaranteed to them by Maryland Law and the Constitution of the United States." ECF 1, at 22 ¶ 111. They allege that Defendants acted "with racial animus, intended to deprive the Plaintiffs of rights guaranteed under the Laws of the State of Maryland, Article I Section 10, Clause 1 of the United States Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution." *Id.* at 21 ¶ 109. In Count II, Plaintiffs bring a claim against all Defendants under 42 U.S.C. § 1985(3) for conspiracy to "depriv[e], either directly or indirectly, the Plaintiffs of their rights guaranteed under the laws of Maryland and the United States Constitution." *Id.* at 22 ¶ 113. In Count III, Plaintiffs bring a 42 U.S.C. § 1986 claim against all Defendants for having "the power to prevent or aid in the prevention of the commission of the [§ 1985] conspiracy and neglected or refused to do so." *Id.* ¶ 118. Finally, in Count IV, Plaintiffs bring a malicious prosecution claim

against Lieutenant Popp for instructing Delphine Smith to file a criminal action against Jeffrey Lilly. *Id.* at 23 ¶¶ 120–25.

Defendants argue that dismissal is warranted for improper claim splitting and for failure to state a claim. *See generally* ECFs 32 and 33. Plaintiffs oppose and argue that consolidation is the proper method of remedying any claim splitting. *See* ECFs 24, 25, and 37.

## II.    LEGAL STANDARD

### A.    Dismissal Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." "A motion to dismiss asserting a violation of the claim splitting doctrine is properly raised under Fed. R. Civ. P. 12(b)(6)." *See Brightview Grp., LP v. Glynn*, Civ. No. SAG-21-3027, 2022 WL 743937, at *6 (D. Md. Mar. 11, 2022) (citations omitted). "Although a motion premised on claim-splitting requires a court to consider facts beyond the complaint, a court may take judicial notice of facts from a prior judicial proceeding so long as the affirmative defense does not raise a disputed issue of fact." *Kashyap, LLC v. Nat. Wellness USA, Inc.*, Civ. No. DKC 11-0459, 2011 WL 2462192, at *3 (D. Md. June 16, 2011) (citing *Q Int'l Courier Inc. v. Smoak,* 441 F.3d 214, 216 (4th Cir. 2006)).

In considering a typical motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

Without turning a motion to dismiss into one for summary judgment, the Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted).

## B.    Consolidation Under Rule 42

Federal Rule of Civil Procedure 42(a) permits that "[i]f actions before the court involve a common question of law or fact, the court may" take several actions, including consolidating the cases. "District courts enjoy substantial discretion in deciding whether and to what extent to consolidate cases." *Hall v. Hall*, 584 U.S. 59, 77 (2018) (citing 9A Wright & Miller § 2383).  The Fourth Circuit has advised district courts applying Rule 42(a) consider certain factors including:

> [1] "whether the specific risks of prejudice and possible confusion" from consolidation "were overborne by the risk of inconsistent adjudications . . . , [2] the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, [3] the length of time required to conclude multiple suits as against a single one, and [4] the relative expense to all concerned of the single-trial, multiple-trial alternatives."

*Campbell v. Bos. Sci. Corp.*, 882 F.3d 70, 74 (4th Cir. 2018) (quoting *Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir. 1982), *rev'd on other grounds*, 712 F.2d 899 (4th Cir. 1983) (en banc)).

## III.    <u>ANALYSIS</u>

### A.    The Parties' Arguments

Plaintiffs' request for consolidation and Defendants' request for dismissal overlap. As noted, Defendants argue that dismissal is appropriate because the doctrine of claim splitting bars this action. *See* ECF 32-1, at 12–21; ECF 33-1, at 2–3. Specifically, Defendants assert that "Plaintiffs filed *Lilly II* to circumvent the Court's orders in *Lilly I*" and that the proper avenue for bringing these claims would have been to move to amend in *Lilly I*. *See* ECF 32-1, at 14–16 (emphasis omitted). Defendants argue that Plaintiffs have engaged in "prejudicial gamesmanship" and "leveraged *Lilly II* to orchestrate a prejudicial media campaign and pressure a settlement." *Id.* at 16–19. Defendants contend that consolidation, which is generally a possible remedy for claim splitting, would be inappropriate as it would "result in vexatious litigation and [would] not promote the interests of judicial economy." *Id.* at 20–21 (emphasis omitted).

Plaintiffs respond that they have not engaged in improper claim splitting, that they only brought *Lilly II* as a separate suit due to "Defendant[s'] eleventh-hour supplemental production of documents" in *Lilly I*, and argue that they could not bring these claims sooner because they are dependent on facts that they did not know earlier. *See* ECF 37, at 6–8. Further, Plaintiffs assert that they are not seeking "the benefit of multiple, simultaneous, opportunities to litigate claims arising out of the same dispute" because they want to consolidate both actions. *See id.* at 8. To that end, they are not seeking additional discovery in this action.[14] *Id.*

---

[14] Indeed, Plaintiffs contend that "converting the instant motion to dismiss to a motion for summary judgment is in the interest of judicial economy." ECF 37, at 4.

Defendants also argue that neither Jeffrey nor Raquel Lilly have stated viable claims for relief. *See* ECF 32-1, at 21–33; ECF 33-1, at 3–12. Specifically, Defendants argue that neither of the Lillys have pled a substantive due process claim with respect to their contractual rights, *see* ECF 32-1, at 21–23, ECF 33-1, at 3–5, that Jeffrey Lilly has not pled a due process violation regarding his employment, ECF 32-1, at 23, and that Raquel Lilly has no due process right regarding her PIB complaint, ECF 33-1, at 5–10. As to Count II, the § 1985 claim, Defendants argue that Plaintiffs have not alleged discriminatory animus or an agreement between Defendants necessary to state a claim. *See* ECF 32-1, at 25–27; ECF 33-1, at 10–11. Further, the doctrine of intracorporate conspiracy precludes liability. ECF 32-1, at 26–27; ECF 33-1, at 11. If Plaintiffs have not sufficiently pled a § 1985 claim, then, Defendants argue, the § 1986 claim necessarily fails as well. *See* ECF 32-1, at 27–28; ECF 33-1, at 12. Finally, Defendants argue that Plaintiffs have not stated a malicious prosecution claim against Lieutenant Popp because Delphine Smith, not Popp, initiated the forgery charges against Jeffrey Lilly and Plaintiffs have not otherwise established causation. *See* ECF 32-1, at 28–33; ECF 33-1, at 12. Defendants also argue that they are protected from liability by qualified immunity on the constitutional claims. ECF 32-1, at 33; ECF 33-1, at 12–14.

Plaintiffs respond that they have a liberty interest in their right to contract, that Jeffrey Lilly has a liberty interest in his reputation, and that Defendants' actions "shock the conscious" (sic) sufficient to state a substantive due process claim. *See* ECF 37, at 8–10. Plaintiffs argue that the intracorporate conspiracy doctrine does not apply because Thompson, as the Consent Decree Monitor, is an alleged co-conspirator outside of the enterprise (i.e., the BPD). *See id.* at 18–19. Finally, Plaintiffs argue that Lieutenant Popp's actions "coordinat[ing] the issuance of criminal proceedings against Jeffrey Lilly with Robert and Delphine Smith" constitute initiation of criminal

proceedings, and that Plaintiffs have otherwise pled all the elements of malicious prosecution. *Id.* at 19–20.

In reply, Defendants argue that dismissal, rather than consolidation, is the proper remedy for Plaintiffs' claim splitting. *See* ECF 40, at 2–6. Defendants also argue that Plaintiffs have not stated sufficient claims for relief and improperly attempt to amend or supplement their complaint through their opposition to the motions by "cherry-pick[ing] facts from the record in *Lilly I*." *Id.* at 6–7. Defendants reiterate that Plaintiffs have not pled sufficient facts for a § 1983 or § 1985 claim and that they failed to respond to Defendants' arguments regarding racial animus for the § 1985 claim and qualified immunity. *Id.* at 13, 16.

Moreover, the parties differ on the impact of the Court's grant of summary judgment to the BPD in *Lilly I* on potential consolidation. Plaintiffs contend that "consolidation remains an appropriate and efficient mechanism to promote judicial economy and streamline resolution of the overlapping claims and factual allegations presented in [*Lilly II*]." ECF 45, at 1–2. Defendants contend that res judicata and collateral estoppel now bar *Lilly II*, but for the same reasons they argued claim splitting barred the suit. ECF 44, at 2–5. Defendants also assert that "[a]lthough not strictly preclusive, the Court's rationale in *Lilly I* applies to the claims in *Lilly II*," citing in particular Plaintiffs' attempts to litigate discovery disputes after the time to do so had run and Plaintiffs' "attempts to constitutionalize ordinary state torts." *Id.* at 5–6. Finally, Defendants argue that permitting *Lilly II* to proceed would cause inefficiency, confusion, undue delay, and prejudice. *Id.* at 6–8.

## B. Claim Splitting Bars *Lilly II*, and Dismissal Is Warranted.

"It is undisputed that it is within a district court's power to stay or dismiss a suit that is duplicative of another federal court suit." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*,

452 F. Supp. 2d 621, 626 (D. Md. 2006) (citing *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976)) (*Sensormatic I*), *aff'd,* 273 F. App'x 256 (4th Cir. 2008) (*Sensormatic II*).  The closely related doctrines of claim splitting and res judicata are tools to this end.  *See Nash County Bd. of Educ. v. Biltmore Co.,* 640 F.2d 484, 490 (4th Cir. 1981).  Under the doctrine of res judicata, a final judgment on the merits in an earlier decision precludes the parties from relitigating issues that were raised or could have been raised during that action.  *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004).

Claim splitting does not require a final judgment.[15]  "The rule against claim splitting 'prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action.'"  *Sensormatic II*, 273 F. App'x at 265 (quoting *Myers v. Colgate–Palmolive Co.,* 102 F. Supp. 2d 1208, 1224 (D. Kan. 2000)).  "When one suit is pending in federal court, a plaintiff has no right to assert another action 'on the same subject in the same court, against the same defendant at the same time.'"  *Id.* (quoting *Curtis v. Citibank, N.A.,* 226 F.3d 133, 139–39 (2d Cir. 2000)).

"The determination of whether two suits arise out of the same cause of action . . . does not turn on whether the claims asserted are identical.  Rather, it turns on whether the suits and the claims asserted therein 'arise out of the same transaction or series of transactions or the same core of operative facts.'"  *Pueschel*, 369 F.3d at 355 (citing *In re Varat Enters., Inc.,* 81 F.3d 1310, 1316 (4th Cir. 1996)); *see also Alston v. Experian Info. Sols., Inc.*, Civ. No. TDC-14-3957, 2016

---

[15] While there is support for the proposition that the partial summary judgment in *Lilly I* is a final judgment for preclusion purposes, *see Intell. Ventures I LLC v. Cap. One Fin. Corp.*, Civ. No. PWG-14-111, 2015 WL 5201356, at *4 (D. Md. Sept. 4, 2015) (citing *Saudi v. Ship Switzerland, S.A.*, 93 F. App'x 516, 520 (4th Cir. 2004)), *aff'd in relevant part,* 850 F.3d 1332 (Fed. Cir. 2017), that factor does not matter here where the doctrine of claim splitting squarely applies and is dispositive of the issue.

WL 901249, at *3 (D. Md. Mar. 3, 2016) (applying this principle to claim splitting), *aff'd,* 680 F. App'x 243 (4th Cir. 2017).  "If the rule against claim splitting applies, a court may stay the second suit, dismiss the suit, or consolidate the actions."  *Brightview*, 2022 WL 743937, at *6 (citing *Mason v. Montgomery Cnty.*, Civ. No. PWG-13-1077, 2015 WL 3891808, at *3 (D. Md. June 23, 2015)).  The Fourth Circuit has affirmed dismissal of a suit for improper claim splitting when the party bringing the new suit did so to circumvent court decisions in the earlier suit and where the new suit's "claims at issue [were] on 'the same subject in the same court, against the same defendant at the same time.'"  *Sensormatic II*, 273 F. App'x at 265 (quoting *Curtis*, 266 F.3d at 139–40).

Here, Plaintiffs agree that the *Lilly II* claims arise out of the same series of events.  *See* ECF 37, at 8.  They contend, however that consolidation, not dismissal, is the proper remedy because "Plaintiff[s] did not learn of the evidence that was necessary to consummate the new claims until well after the deadline to amend, and once they did, they acted immediately."  *Id.* at 7.  Plaintiffs distinguish their actions from those of the plaintiff in *Sensormatic* who, unlike the Lillys' self report, "did not diligently address the need for an amendment of the scheduling order when it first learned of the [new evidence purportedly giving rise to the new claim], before the scheduling order deadline passed."  *Id.* (quoting *Sensormatic II*, 273 F. App'x at 260).

The deadline to amend the *Lilly I* complaint was February 2, 2024, and Plaintiffs never asked to amend it.  *Lilly I*, ECF 44, at 2.  Plaintiffs essentially assert that they were forced to file *Lilly II* due to "misl[eading] discovery responses from the *Lilly I* defendants.  *See* ECF 37, at 4, 7–8.  While Plaintiffs insist that they have acted with diligence in bringing the *Lilly II* claims, the proper procedure for doing so would have been to move for an extension of the amendment deadline and/or move for leave to file an amended complaint, explaining why the circumstances

amounted to good cause to do so out of time.  It is not unusual for the identities of previously unknown parties or facts supporting additional causes of action to be revealed during discovery. The Federal Rules account for such circumstances.  "Good cause" to amend a scheduling order under Rule 16 "may be shown if the plaintiff uncovered previously unknown facts during discovery that would support an additional cause of action, or if . . . despite the exercise of reasonable diligence, the evidence supporting the proposed amendment would not have been discovered until after the amendment deadline had passed."  *Belcher v. W.C. Eng. Inc.*, 125 F. Supp. 3d 544, 549 (M.D.N.C. 2015) (additional internal quotation marks omitted) (quoting *Cole v. Principi,* No. 1:02CV00790, 2004 WL 878259, at *7 (M.D.N.C. Apr. 22, 2004)).

Plaintiffs have not demonstrated good cause to permit late amendment to *Lilly I*, especially in the manner they have done so.  Plaintiffs have not explained *how* the alleged discovery violations committed by the BPD prevented them from bringing these claims sooner.  Plaintiffs take particular issue with interrogatory responses regarding Deputy Commissioner Nadeau:

> In BPD's sworn answers to interrogatories, BPD stated, and Brian Nadeau certified that there were no complaints ever made against Deputy Commissioner Nadeau. (*Lilly I,* ECF No. 87, Ex. 3).  However, after the news media took interest in a story that they clearly found to be conscious shocking [sic], current and former members of BPD shared with Plaintiffs' counsel their experiences.  Among those individuals was Stepahanie Lansey, who was the Major of PIB reporting directly to Brian Nadeau. Major Lansey has sworn out an affidavit testifying that she made a complaint against Brian Nadeau to Commissioner Harrison, and that Brian Nadeau confronted her about it. (*Lilly I*, ECF No. 87, Ex. 4).  The complaint was the reason Major Lansey left PIB – because she was no longer comfortable working under Brian Nadeau.  It is hard to believe that this is something that was accidentally forgotten by the Deputy Commissioner and regardless of his motive, the existence of this complaint would have dramatically changed the scope of discovery and the Plaintiffs' assessment of the case.

ECF 37, at 4.  A review of the interrogatory responses reveals that Plaintiffs mischaracterize the interrogatory answer and overstate its import.

Jeffrey Lilly's Interrogatory 15 in *Lilly I* asked that the BPD to "[s]et forth any discipline of Brian Nadeau, complaints regarding Mr. Nadeau, or investigations of Mr. Nadeau, including the date of any complaint, content of the complaint, the identity of the complainant and the content of any resulting investigation and/or discipline, from the commencement of his employment with BPD to present day." *Lilly I*, ECF 87-3, at 13. The BPD objected to this interrogatory because it "s[ought] information that is outside the permissible scope of discovery and wholly irrelevant to the subject matter of this litigation. In a Memorandum Opinion and Order dated September 25, 2023, the Court dismissed all counts against Brian Nadeau, and he is no longer a defendant in this case." *Id.* at 14. The BPD further responded that "the answer to this Interrogatory may be determined by review of the business records produced in this case and directs Plaintiff to the [ ] documents produced in response to its production requests at BPD 000228." *Id.* Interrogatory 23 asked the BPD to "[s]et forth and identify all litigation, administrative charges, or internal complaints in which Brian Nadeau, Lekeshia Blue, or the PIB are named as parties." *Id.* at 20. The BPD objected to this interrogatory as well, asserting, in relevant part, that it was "duplicative and seeks information that was previously asked and answered by Interrogatory No. 15" and "seeks information that is outside the permissible scope of discovery and wholly irrelevant to the subject matter of this litigation." *Id.* at 21.

Contrary to Plaintiffs' assertion, these responses, which are essentially objections to the interrogatories posed, are not a "certif[ication] that there were no complaints ever made against Deputy Commissioner Nadeau." *See* ECF 37, at 4. Plaintiffs contend that "had Brian Nadeau truthfully answered Plaintiffs' interrogatories and disclosed the complaint made by Stephanie Lansey, or even mentioned her as a witness with possible information, the Plaintiffs may have uncovered evidence that was sufficient to support the additional claims earlier." *Id.* at 7. But

Plaintiffs never tie Lansey's complaint to any specific allegations in brought in *Lilly II* or explain exactly *how* that complaint was integral to the *Lilly II* claims.[16]

Moreover, as the Court noted in *Lilly I*, Plaintiffs could have sought to challenge the objections but did not do so. *See Lilly I*, ECF 92, at 21 ("If Plaintiff was dissatisfied with BPD's response to the interrogatory or believed further supplementation was warranted, the rules required Plaintiff to address that concern at an earlier stage of the process." (citing *Info-Hold, Inc. v. Sound Merch., Inc.*, 538, F.3d 448, 458 (6th Cir. 2008)). It cannot be said that the BPD's interrogatory responses in *Lilly I*, the sufficiency of which Plaintiffs never apparently challenged or asked the Court to address, improperly misled Plaintiffs.

Plaintiffs also point to three recordings they allege the BPD failed to produce in discovery and destroyed. *See* ECF 37, at 7–8. While spoliation of evidence or failure to produce discoverable materials can certainly form the basis for properly sought sanctions, Plaintiffs have not explained how the timing of the filing of the *Lilly II* complaint flows from Defendants' alleged failure to ever produce these recordings. The Court struggles to understand what new claims could only have become apparent based on this alleged discovery violation given Plaintiffs' argument that they have been improperly precluded from ever reviewing these recordings. This is particularly confusing when one of the recordings is of a hearing where Jeffrey Lilly himself was present. *See* ECF 37, at 7–8 (contending that Defendants improperly withheld recording of Jeffrey Lilly's suspension hearing despite reminders that the hearing be recorded (citing *Lilly I*, ECF 87-8 (emails

---

[16] Indeed, it appears that the complaint Lansey made against Nadeau had nothing to do with the facts underlying this case and that she did not even work at PIB during the relevant time. *See Lilly I*, ECF 87-4, at 1–6 (affidavit of Stephanie Lansey noting that she worked at PIB (formerly Internal Affairs) from February 2018 until April 2021 and noting that her complaint concerned (1) how Nadeau made decisions during her time in PIB and (2) comments he allegedly made about civilians that Lansey perceived as unprofessional).

sent in advance of the May 5, 2022 hearing))); ECF 1, at 13 ¶ 66 ("On May 5, 2022, Mr. Lilly appeared before members of the PIB to determine if his suspension would continue to be unpaid.") Further, Plaintiffs never asked the Court for help in enforcing any requests for this discovery.

As noted, Plaintiffs never moved to extend the deadline to amend/move for joinder in *Lilly I*. Plaintiffs also have not explained how they were only able to bring *Lilly II* after the BPD's purportedly late "incomplete, false, and misleading" discovery responses in *Lilly I*. *See* ECF 37, at 4. Plaintiffs assert that "the crux of the allegations in this lawsuit occurred after the date *Lilly I* was filed." *Id.* at 5. But at the same time, Plaintiffs appear to recognize that this description is inaccurate since they filed the *Lilly II* complaint on January 27, 2025, because "they were up against a three-year statute of limitations for filing new charges." *Id.* Indeed, while some of the allegations occurred after the filing of the initial *Lilly I* complaint, *see* ECF 1, at 15 ¶ 73 (referencing the filing of Civ. No. 22-2752-BAH), Plaintiffs later amended the complaint in *Lilly I*. *See Lilly I*, ECF 24. In truth, the only allegations in *Lilly II* that occurred after the filing of the operative *Lilly I* amended complaint on January 31, 2023, concern Plaintiffs' own actions, not Defendants'. *See* ECF 1, at 20 ¶¶ 102, 104 (detailing specific financial, emotional, and physical harms the Lillys faced in April and May 2023).

Plaintiffs have not presented any meritorious justification for bringing *Lilly II* as a separate suit. To the extent it would even be practicable given that summary judgment motions have been decided in *Lilly I*, Plaintiffs have also not demonstrated good cause to permit amendment of their complaint there. Without such justification, the Court is left with no conclusion except to find that Plaintiffs filed *Lilly II* to circumvent the deadlines and attempt to ameliorate their failure to diligently pursue discovery in *Lilly I*. Plaintiffs "may not use this parallel proceeding to effect an end-run around the deadline for amending the complaint." *Hare v. Opryland Hosp., LLC,* Civ.

No. DKC 11-1439, 2011 WL 6153128, at *3 (D. Md. Dec. 9, 2011) (dismissing second suit and denying motion to consolidate where plaintiffs did not explain why they did not or could not bring negligence claim in first suit); *see also Chihota v. Fulton, Friedman & Gullace, LLP*, Civ. No. WDQ-12-0975, 2012 WL 6086860, at *3 (D. Md. Dec. 5, 2012) (dismissing second suit where counsel filed it to avoid statute of limitations issue caused by counsel's own failure to meet the service deadline in earlier-filed suit).  As such, dismissal, not consolidation, is warranted.

While the Court does not need to engage in the full Rule 12(b)(6) analysis because it finds that Plaintiffs have engaged in impermissible claim splitting, the significant infirmities Defendants have identified in Plaintiffs' pleaded claims also counsel in favor of dismissal over consolidation. In particular, the § 1983 allegations against Deputy Commissioner Nadeau are essentially identical to those brought against the BPD in *Lilly I*.  Despite the Court's invitation to amend and bring individual claims against him, *see Lilly I*, ECF 34, at 29 n.15, Plaintiffs did not do so.  Further, the § 1985 and § 1986 claims are easily disposed of.  Necessary to proceed on § 1985(3) claim is an allegation that the defendants committing the conspiracy are "motivated by a specific class-based, invidiously discriminatory animus." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Simmons v. Poe,* 47 F.3d 1370, 1376 (4th Cir. 1995)).  Plaintiffs do no more than conclusorily allege "racial animus," and only in the context of the § 1983 claim, not the § 1985 claim.  ECF 1, at 21 ¶ 109.  Indeed, Plaintiffs do not allege the race of any of the parties or make even the barest attempt to tie any Defendant's actions to racial animus.  *See generally* ECF 1.  This pleading failure is fatal to their § 1985 claim, *see Twombly*, 550 U.S. at 555, and, consequently, to the § 1986 claim, *see Davis v. Hudgins*, 896 F. Supp. 561, 571 (E.D. Va. 1995) ("It is well settled that a claim under [section 1986] derives from a Section 1985 claim, and failure on the Section

1985 claim also defeats the Section 1986 claim." (quoting *Burcher v. McCauley,* 871 F. Supp. 864, 869 n.4 (E. D. Va. 1994))), *aff'd,* 87 F.3d 1308 (4th Cir. 1996).

While the viability of the § 1983 claims against the other Defendants and the malicious prosecution claim against Lieutenant Popp are not as easily decided,[17] the Court notes that even with the benefit of the prior admonition that their *Lilly I* § 1983 claim lacked clarity, *Lilly I*, ECF 34, at 21, Plaintiffs' § 1983 claim in *Lilly II* is no more clear, *see* ECF 1, at 21–22 ¶¶ 109–11 (alleging the elements of a § 1983 claim without tying the allegations to any of the specific facts or identifying the specific rights allegedly infringed upon). This, despite having engaged in discovery and despite having been warned that "considerably more will be necessary to establish liability under § 1983." *Lilly I*, ECF 34, at 23. Plaintiffs' failure to more clearly and adequately plead their claims lends further support to the Court's conclusion that Plaintiffs have not diligently pursued their claims such that dismissal is warranted.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss, ECFs 32 and 33, are GRANTED due to improper claim splitting. The motion to consolidate, ECF 24, is DENIED. A separate implementing order will issue.

Dated: <u>February 25, 2026</u>                           <u>                /s/                </u>

                                                                    Brendan A. Hurson
                                                                    United States District Judge

---

[17] To be clear, the Court does *not* find that but for the claim splitting, Plaintiffs other claims would be allowed to proceed. The Court notes that Plaintiffs have not responded to Defendants' qualified immunity arguments. *See generally* ECF 37. "Failure to respond to conspicuous, nonfrivolous arguments in an opponent's brief constitutes a waiver of the corresponding claims." *Evans v. City of Lynchburg*, 766 F. Supp. 3d 614, 618 (W.D. Va. 2025) (citations omitted).